777 So.2d 781 (1999)
Larry Wayne WHITEHEAD
v.
STATE.
CR-95-2129.
Court of Criminal Appeals of Alabama.
August 27, 1999.
Rehearing Denied October 22, 1999.
*794 Hoyt L. Baugh, Jr., Rainsville, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
LONG, Presiding Judge.
The appellant, Larry Wayne Whitehead, was convicted of three counts of capital murder in connection with the murder of Ernest Andrew Whitten. The murder was made capital (1) because it was committed during a burglary in the first degree, see § 13A-5-40(a)(4), Ala.Code 1975; (2) because Whitten, at the time of his murder, had testified before a grand jury that had indicted Whitehead for theft in the first degree, see § 13A-5-40(a)(14), Ala.Code 1975; and (3) because Whitten, at the time of his murder, had been subpoenaed to testify at Whitehead's trial on the theft charge, see § 13A-5-40(a)(14), Ala.Code 1975. By a vote of 12-0, the jury recommended that Whitehead be sentenced to death. The trial court accepted the jury's recommendation and sentenced Whitehead to death. This appeal followed.
On appeal from his convictions, Whitehead raises 22 issues, many of which he did not raise by objection in the trial court. Because Whitehead was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting, in turn, United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)).
The evidence presented at trial tended to show the following. Whitehead was an employee at Hudson Foods, Inc. He had been punching his time card when he arrived at work, leaving immediately thereafter, and then returning to work and punching the time card to indicate he had worked a full day. Whitehead's codefendants, James Matthew Hyde and Stephen Brookshire, had, on several occasions, helped Whitehead with his scheme to be paid without actually working, by punching Whitehead's time card for him, thus clocking him in and out of work. Hudson Foods eventually became aware of Whitehead's scheme, and Detective Andrew Whitten of the Albertville Police Department was assigned to investigate Whitehead *795 and the theft allegations Hudson Foods had made against him. Whitten interviewed Whitehead concerning the theft allegations, and he was eventually arrested and charged with theft of property in the first degree. Specifically, he was charged with stealing approximately $12,000 from Hudson Foods.
At the time of his arrest, Whitehead was on parole for a prior felony conviction. A parole revocation hearing was held, and Whitten testified at that hearing concerning his investigation of the Hudson Foods theft case. Upon conclusion of the hearing, however, Whitehead's parole was not revoked. Approximately one month later, in September 1994, Whitehead was indicted for theft of property in the first degree. Whitten testified before the grand jury that indicted Whitehead concerning his investigation of the theft charges. Whitten was also subpoenaed to testify at Whitehead's trial, which was set to begin on January 30, 1995. Whitten was shot on January 24, 1995, and on January 25, 1995, he died from injuries he sustained in the shooting.
Whitehead's codefendant Stephen Brookshire testified that Whitehead approached him on the morning of January 24, 1995, and asked him if he would "drive for him" later that night, telling Brookshire that he had to "get rid of his witness." (R. 1403.) Brookshire knew that Whitehead had been charged with theft. In fact, Brookshire testified at Whitehead's parole revocation hearing to the effect that he had clocked Whitehead in and out of work on several occasions.
According to Brookshire, Whitehead and Hyde came to his mobile home on the evening of January 24, 1995, and at approximately 9:00 p.m. that night, the three men left in an automobile, with Brookshire driving. Brookshire testified that they drove to Whitten's neighborhood, and he parked the car near Whitten's house and turned off the headlights. Brookshire further testified that Hyde got out of the car and that Whitehead told him, "Don't mess up." (R. 1416.) Brookshire stated that Hyde had been gone for several minutes when he heard a single gunshot. According to Brookshire, Hyde came running back to the car, jumped in, and repeatedly told Whitehead that he was "sorry" because Whitten was not dead. Brookshire stated that Hyde told Whitehead that he was able to shoot Whitten only once because, after the first shot, his gun had jammed. Brookshire testified that Whitehead told Hyde it was okay, "we'll get him later." (R. 1419.) Brookshire stated that he knew when they left his mobile home that night that they were going to "get rid of Whitehead's witness; however, he stated that he did not know the identity of the witness.
Numerous witnesses for the State testified that Whitehead talked frequently about filing a multimillion-dollar civil law-suit against Hudson Foods for making false allegations of theft against him. On numerous occasions, Whitehead was heard by these witnesses saying that Whitten was the only witness in the theft case and that if Whitten was "out of the way," he would be acquitted and he could win the civil lawsuit. Wanda Self, Whitehead's girlfriend, with whom he was living at the time of the murder, testified that shortly after the murder, Whitehead told her that "the deed was done." (R. 1136.) There was further testimony that Whitehead had said, with regard to his upcoming trial on the theft charges, that he would "shoot up the courtroom with Andy Whitten in it." (R. 1278.)
There was also testimony from one of Whitten's neighbors that, several days before the murder, a man knocked on his door wanting to know where Whitten lived. Wanda Self and her daughter both testified that they were with Whitehead several days before the murder when he was looking for Whitten's house and knocked on the door of a house near Whitten's to find out where Whitten lived.
Randall Ogle testified that on January 25, 1995, Whitehead asked him to get rid *796 of a .380 caliber semiautomatic pistol, the same type of weapon used to kill Whitten. Ogle stated that he threw the gun in a river. The police were unable to find the gun.
Also, several witnesses who saw Hyde shortly before he left with Whitehead and Brookshire on the evening Whitten was killed testified that Hyde was wearing a blue sweatshirt-type jacket and baseball cap on that night. Further testimony revealed that shortly after the murder, on the same night, Hyde was seen putting a blue sweatshirt-type jacket and a baseball cap into a white plastic bag; the jacket and the cap had been torn into pieces. The testimony revealed that Hyde threw the plastic bag into a river. The police found that plastic bag containing the items of clothing on the day after Whitten's murder.
Whitehead did not testify at his trial; however, his testimony from Hyde's trial was read into evidence at his trial. At Hyde's trial, Whitehead testified that he, and not Hyde, had killed Whitten. Whitehead stated that when they went to Whitten's house on the night of the shooting, Hyde and Brookshire thought that they were going to a drug dealer's house to buy drugs. After the State rested its case, the defense called no witnesses.

I.
Whitehead contends that several pretrial rulings made by the trial court were erroneous. (Issue X in Whitehead's brief to this court.)

A.
Whitehead first argues that the trial court's denial of his motion requesting funds to obtain expert assistance was improper, in that it violated the principles of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In a pretrial motion filed on June 28, 1995, Clyde Baker, the attorney originally appointed to represent Whitehead, asserted the general defense that Whitehead suffered from "various serious mental disorders and from mental retardation." (C. 61.) Counsel did not present the trial court with any evidence of these alleged mental disorders or of Whitehead's alleged mental retardation. Counsel claimed in this motion that Whitehead's alleged "mental condition [would] be a significant factor at both phases of the trial" and that the expert assistance of a psychologist was therefore necessary for Whitehead to prepare his defense. (C. 62.) Counsel did not state specifically how a psychologist would aid Whitehead in his defense.
During a pretrial motion hearing, Whitehead's request for expert assistance was discussed by the trial court and by counsel for both the State and the defense. At the hearing, the following exchange occurred:
"[Whitehead's counsel, Mr. Baker]: There's a motion to inspect, examine, and possibly test the physical evidence that the State expects to introduce.
"The Court: That will be granted.
"[Baker]: There is a request for funds for an expert witnessor expert assistance if there areif the previous motion produces anything.
"The Court: I read that quickly while waiting for the case action summary, and I understand your point, but I think you have to show me that there is an expert needed or one with which you are to be confronted, Mr. Baker, so that apparently needs to be set at a later time also.
"[Baker]: But we have to know what that physical evidence is before
"The Court: No, I'm speaking of expert witness. You're not asking for mental evaluation or anything of that nature?

"[Baker]: No, sir.

"The Court: Is the State at the present time thinking of using a psychologist or psychiatrist in the case?
"[Prosecutor]: No, sir.
"[Baker]: This expert witness that we are asking for is to examine whatever *797 the State produces in the previous motion.
"The Court: Oh, well, that will be granted, but the way your motion read, you were following the Ake case and asking for a psychologist.
"[Baker]: Well, I think they are both here. What I really am asking for is assistance with the physical.

(R. 16-18.) (Emphasis added.) The above-quoted exchange shows that Whitehead's counsel was concerned only with obtaining funds to hire an expert to examine the physical evidence in the case, not to hire an expert psychologist.
On January 12, 1996, the trial court allowed Mr. Baker to withdraw as Whitehead's counsel because Mr. Baker was retiring from the active practice of law. On January 26, 1996, Hoyt Baugh was appointed to represent Whitehead. The record shows that Mr. Baugh filed no motions requesting funds for expert psychological assistance, nor did he pursue the motion for funds that was previously filed by Mr. Baker.
In Ex parte Dobyne, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996), the Alabama Supreme Court stated:
"[I]n Dubose v. State, 662 So.2d 1189 (Ala.1995), this Court held that the Ake [v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985),] principles relating to assistance of experts are not limited to psychiatrists. The Ake principles, which are grounded in the due process guarantee of fundamental fairness, apply to assistance by nonpsychiatric experts when an indigent defendant makes a proper showing that the requested assistance is needed in order for the defendant to have `a fair opportunity to present his defense.' Dubose, 662 So.2d at 1194. Specifically, a defendant, in order to be entitled to funds to pay for an expert, must show more than a mere possibility that he or she will receive useful assistance from the expert. Rather, the defendant must show a reasonable probability that the expert would aid in the defense and that the denial of an expert to assist at trial would result in a fundamentally unfair trial. In the past, Alabama decisions have been based upon whether the defendant made an adequate showing of a need for the requested expert. Dubose, 662 So.2d at 1191; see also, Smith v. State, 623 So.2d 369 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1030, 114 S.Ct. 650, 126 L.Ed.2d 607 (1993); McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990); Siebert v. State, 562 So.2d 586 (Ala.Cr. App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Stewart v. State, 562 So.2d 1365 (Ala.Cr.App.1989); McGahee v. State, 554 So.2d 454 (Ala.Cr. App.), aff'd, 554 So.2d 473 (Ala.1989)."
672 So.2d at 1357-58.
Whitehead failed to present any evidence to the trial court demonstrating that an expert psychologist was necessary to his defense, much less that he was denied a fair opportunity to present his defense because his request for funds was denied. Further, Whitehead did not show that the denial of funds to hire an expert would result in a fundamentally unfair trial. Thus, we find no error as to this matter.

B.
Whitehead also argues that he was denied his right to a fair trial and to an impartial jury when the trial court refused to allow him to conduct individual, sequestered voir dire examination of the jury venire regarding the jurors' exposure to pretrial publicity.
The 60-member venire in Whitehead's case was questioned in four panels. At the conclusion of the questioning of each panel, the trial court allowed the parties to question any member of the panel individually. This court has held that questioning the venire in panels meets the requirements of due process and provides reasonable assurance that any prejudice on *798 the part of the jurors will be exposed. Haney v. State, 603 So.2d 368, 402 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
"`In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court.' Coral v. State, 628 So.2d 954, 968 (Ala. Cr.App.1992). `The fact that the appellant's case involved capital murder is not alone reason to require individual voir dire.... A trial court's decision in denying individual voir dire examination of a jury panel will not be disturbed on appeal absent an abuse of that discretion.' Smith v. State, 588 So.2d 561, 579 (Ala.Cr.App.1991). See also Henderson v. State, 583 So.2d 276, 283 (Ala.Cr.App. 1990), affirmed, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992)."
Taylor v. State, 666 So.2d 36, 66 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). See also Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.1999); and George v. State, 717 So.2d 827 (Ala.Cr.App.), aff'd in relevant part, 717 So.2d 844 (Ala.1996), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998). Whitehead offered no evidence in the trial court showing how he was prejudiced as a result of prospective jurors being questioned in panels, as opposed to being questioned individually in a sequestered setting. On appeal, he offers only general arguments concerning the possibility of prejudice and fails to show that any comments by a prospective juror improperly influenced other members of a panel. He has presented no proof that the pretrial publicity was so extensive that the method of voir dire was inadequate to ensure juror impartiality.
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion." Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996). A careful review of the record reveals that the method of voir dire employed by the trial court was sufficient to "provide[] reasonable assurance that prejudice would have been discovered if present." Haney, supra, 603 So.2d at 402. Accordingly, we find that the trial court did not abuse its discretion by denying Whitehead's motion for individual, sequestered voir dire examination.

C.
Whitehead argues that the trial court erred when it allowed the jury to separate over his objection. Citing Rule 19.3(a)(1), Ala.R.Crim.P., Whitehead maintains that, without his consent, the trial court was not permitted to allow the jurors to separate during the trial. Whitehead argues that Rule 19.3(a)(1) takes precedence over § 12-16-9, Ala.Code 1975, which places the decision whether to allow the jury to separate during the pendency of the trial within the complete discretion of the trial court; therefore, he says, the trial court erred in unilaterally deciding to allow the jurors to separate over his objection.[1] Recently, in Ex parte Stewart, 730 So.2d 1246 (Ala.1999), the Alabama Supreme Court addressed this identical claim and decided it adversely to the position taken by Whitehead. See also Ex parte Smith, 727 So.2d 173 (Ala.1999). Therefore, we find Whitehead's claim to be without merit.

*799 D.
Whitehead argues further that the trial court erred in denying his motion for a change of venue based on excessive pretrial publicity because, he says, the extensive publicity surrounding his case made it impossible for him to receive a fair and impartial trial in Marshall County. In his motion, Whitehead referred to newspaper articles published about Whitten's murder and about Whitehead's and his codefendants' alleged involvement in the murder. Whitehead claimed in his motion that the fact that Shannon Mitchell, an attorney who represented Whitehead in the Hudson Foods theft case and who was tried for conspiracy to commit murder after Whitten's death, was granted a change of venue for his trial to Calhoun County, where he was acquitted, and the fact that Whitehead's codefendant Matthew Hyde was denied a change of venue from Marshall County, where he was subsequently convicted of capital murder, demonstrated the possible effect that a change of venue could have had on his own trial.
After Whitehead's counsel orally argued his change-of-venue motion before the trial court, the following exchange occurred:
"[Prosecutor]: Judge, six weeks ago we entered into the trial of James Matthew Hyde [Whitehead's codefendant] in this courtroomI think six weeks ago today. I think there were approximately 70 jurors that we had on the initial panel that we struck that jury from. And, of course, Your Honor was the presiding judge in that case. And I think that there were members of that jury panel that had never heard of this case, never heard about the death of Andy Whitten, never heard about the trial of Shannon Mitchell, had never heard about James Matthew Hyde or Larry Whitehead. Although they were the very small minority of that jury panel that had not heard about it, a great majority of the jurors on that panel recalled that they had read or heard something in the news media at some point in time but recalled no details about the offense.
". . . .
"[Prosecutor]: Your Honor, I think that public information through the news media alone is not sufficient basis for a change of venue. And we would respectfully ask this Court to allow us to question jurors that we have impaneled before the Court now and in the morning and the next couple of days and that the Court would make its determination based upon what those jurors say themselves.
"[The Court]: No question that that's what we will do.
"[Whitehead's counsel]: I don't have any objection to that, Your Honor. Just for the record, Your Honor, I want to make sure that [the prosecutor] and I are in agreement that the numbers, the 10,800 and the 2,000I mean, thewhatever the numbers are for The Sand Mountain Reporter, 11,000, we stipulate to those circulation
"[Prosecutor]: Judge, I'm not contesting those numbers. I don't know the exact numbers, but I think the Court even could take judicial knowledge of the fact that The Advertiser Gleam and The Sand Mountain Reporter are distributed throughout Marshall County in significant numbers and that also The Gadsden Times and Huntsville Times are considered local papers.
"[Whitehead's counsel]: Your Honor, may I have leave to copy these articles rather than present the whole papers and offer those tomorrow?
"The Court: That will be fine.
"[Whitehead's counsel]: Thank you, Judge. That's all we have, Your Honor."
(R. 193-96.) As the above-quoted exchange reveals, Whitehead's counsel had no objection to the trial court reserving its ruling on his motion for a change of venue until after the voir dire of the jury venire, so that the trial court could determine *800 what effect, if any, the pretrial publicity had had on the prospective jurors. As the State correctly points out in its brief to this court, Whitehead did not renew his motion for a change of venue at any time during, or upon completion of, voir dire examination.
When reviewing the correctness of a trial court's ruling on a motion for a change of venue, we must determine whether the trial court abused its discretion.
"`The determination of whether or not to grant a motion for change of venue is generally left to the sound discretion of the trial judge because he has the best opportunity to assess any prejudicial publicity against the defendant and any prejudicial feeling against the defendant in the community which would make it difficult for the defendant to receive a fair and impartial trial.'
"Nelson v. State, 440 So.2d 1130, 1132 (Ala.Cr.App.1983). See also Trahan v. State, 450 So.2d 1102 (Ala.Cr.App.1984). An appellant must prove a `gross abuse of discretion' before the trial court's ruling on a motion for change of venue will be reversed on appeal. Anderson v. State, 443 So.2d 1364 (Ala.Cr.App. 1983)."
Hunt v. State, 642 So.2d 999, 1042 (Ala.Cr. App.1993), aff'd, 642 So.2d 1060 (Ala.1994). "A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case." Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).
In Oryang v. State, 642 So.2d 979 (Ala.Cr.App.1993), we stated the following with regard to the standard a trial court should use in deciding whether to grant a motion for a change of venue based upon pretrial publicity:
"`"`There are two situations in which a change of venue is mandated. The first is when the defendant can show that prejudicial pre-trial publicity "has so saturated the community as to have a probable impact on the prospective jurors" and thus renders the trial setting "inherently suspect." McWilliams v. United States, 394 F.2d 41 (U.S.C.A. 8th Cir.1968); Dobbert v. Florida, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). In this situation, a "pattern of deep and bitter prejudice" must exist in the community. Irvin v. Dowd, [366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)] supra.
"`"`The second situation occurs when the defendant shows "a connection between the publicity generated by the news articles, radio and television broadcasts in the existence of actual prejudice." McWilliams v. United States, supra.'
"`"Nelson, 440 So.2d at 1131-32."
"`Thomas v. State, 539 So.2d 375 (Ala. Crim.App.1988). See also Robinson v. State, 430 So.2d 883 (Ala.Crim.App. 1983).'
"Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"Thus, a change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,"` Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact *801 `that a case generates even widespread publicity.' Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). `"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945]."' Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala. Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977). Furthermore, in order for a defendant to show prejudice, the `"proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).' Ex parte Grayson, 479 So.2d 76, 80 (Ala. 1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985)."
642 So.2d at 982-83.
We acknowledge that Whitehead's case and the cases of his codefendants received extensive publicity in Marshall County. However, "`in order to obtain a change of venue, it must be shown that pre-trial publicity surrounding the case was inherently prejudicial.'" Oryang, 642 So.2d at 983, quoting Holladay v. State, 549 So.2d 122, 125 (Ala.Cr. App.1988), aff'd, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989). We recognize that the "presumptive prejudice" standard is "`rarely' applicable, and is reserved for only `extreme situations.'" Hunt, 642 So.2d at 1043, quoting Coleman v. Kemp, 778 F.2d 1487, 1537 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). We also recognize that Whitehead's burden to show that pretrial publicity so saturated the community as to deny him a fair trialis a very heavy burden. See Hunt, supra at 1043. "`Prejudicial' publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. `Publicity' and `prejudice' are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial." 642 So.2d at 1043.
We do not find that the pretrial publicity in this case so "pervasively saturated" the community as to render the court proceedings nothing more than a "hollow formality." Oryang, supra, at 983. On appeal, Whitehead offers us nothing more than the assertion that "many of the jurors in Mr. Whitehead's jury pool had heard about the case." (Whitehead's brief to this court, p. 55.) However, as the Alabama Supreme Court stated in Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `the proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978)."
479 So.2d at 80. "`"The relevant question is not whether the community remembered the case, but whether the jurors at [the accused's] trial had such fixed opinions that they could not judge impartially *802 the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984).'" Siebert v. State, 562 So.2d 586, 589 (Ala.Cr.App. 1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990), quoting Fortenberry v. State, 545 So.2d 129 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).
The jury venire in this case was extensively and thoroughly examined regarding each prospective juror's knowledge about the case. Whitehead has failed to show either that the community was saturated with pretrial publicity or that actual prejudice existed among the jurors at his trial. The record contains no indication that any juror had a fixed opinion of Whitehead's guilt or that the verdict was not impartially rendered on the evidence presented at trial. Our review convinces us that the trial court did not abuse its discretion in denying Whitehead's motion for a change of venue.

E.
Whitehead argues that the trial court failed to enforce "the rule" to exclude witnesses from the courtroom when it allowed Detective Tommy Cole, the chief of detectives of the Albertville Police Department and one of the lead investigators in the case and a witness for the State, to remain in the courtroom during his trial. See Rule 9.3(a), Ala. R.Crim.P. Although Whitehead filed a motion to sequester witnesses, which was granted by the trial court, Whitehead did not object at any point during trial to Detective Cole's presence in the courtroom during the testimony of other witnesses. Thus, we will review his claim pursuant to the plain-error rule. Rule 45A, Ala. R.App.P.
"Rule 9.3(a), Ala.R.Crim.P., authorizes the trial court to exclude potential witnesses from the courtroom prior to or during proceedings. The Committee Comments to Rule 9.3(a) state that `the power to exclude and separate witnesses is entirely a matter of discretion with the trial court.' The Comments cite Teague v. State, 245 Ala. 339, 16 So.2d 877 (1944); and Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), cert. denied, 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958). `"Investigators or police officers commonly are exempted from the rule." J. Colquitt, Alabama Law of Evidence § 6.15 at 333 (1990). See also C. Gamble, McElroy's Alabama Evidence § 286.01 (4th ed.1991). See also Rule 9.3, Ala.R.Crim.P.' Taylor v. State, 666 So.2d 36, 66 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). `Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of a trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial.' Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991) (citing several Alabama cases holding to same effect)."
Weaver v. State, 710 So.2d 480, 484 (Ala. Cr.App.1997); see also Johnson v. State, 648 So.2d 629 (Ala.Cr.App.1994). Furthermore, even where a witness remains in the courtroom in violation of the rule, the trial court's decision as to whether the witness will be permitted to testify is not subject to review. See Jackson v. State, 502 So.2d 858 (Ala.Cr.App.1986).
Whitehead has failed to present any argument on appeal to show that the trial court abused its discretion in allowing Detective Cole to remain in the courtroom during the trial. Thus, we find no error, plain or otherwise, as to this claim.
Whitehead also contends that the trial court erred in allowing the victim's family to remain in the courtroom during the trial. The record shows that Whitehead did object to the presence of the *803 victim's family in the courtroom; however, he had no objection to the victim's representative sitting at the prosecution's table.
While acknowledging that the law permits the victim's family to remain in the courtroom and even to sit at the prosecution's table during the trial, Whitehead nonetheless argues that he was prejudiced as a result of the presence of Whitten's family because, he says, the presence of family members "gave them a special role in the proceedings and graced them with the state's imprimatur" and, therefore, according to Whitehead, prevented the jury from "critically examin[ing] the weight of their testimony."[2] (Whitehead's brief to this court, p. 56.) Other than his vague, unsupported assertion that he was "prejudiced," Whitehead has offered no argument to demonstrate how he was prejudiced as a result of the presence of the victim's family during his trial.
As we previously stated, the decision whether to exclude witnesses from the courtroom during trial is a matter left entirely to the trial court's discretion. See Weaver, supra. Moreover, the Alabama Crime Victims' Court Attendance Act, §§ 15-14-50 to 15-14-57, Ala.Code 1975, gives the victim of an offense or the victim's representative the right to be present in the courtroom and seated alongside the prosecutor during the trial of the individual charged with the offense. See Burgess v. State, 723 So.2d 742 (Ala.Cr.App. 1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999). This right applies in both capital and noncapital cases. See Henderson v. State, 583 So.2d 276 (Ala.Cr. App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). Unless there is a valid reason, a victim's family should not be excluded from the trial. See Burgess, supra, citing Few v. State, 518 So.2d 835, 836 (Ala.Cr.App.1987), and cases cited in Few.
Whitehead has failed to show a valid reason why Whitten's family should have been excluded from the trial. Thus, we find no abuse of discretion in the trial court's decision to allow the Whitten family to remain in the courtroom during the trial.

II.
Whitehead contends that the prosecution improperly used its peremptory strikes to remove female prospective jurors from the venire, in violation of the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). (Issue V in Whitehead's brief to this court.) Initially we note that Whitehead did not object to the State's use of its peremptory challenges at trial; therefore, we will review this claim pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
On appeal, the only evidence Whitehead offers in support of this claim is that the prosecutor used 17 of his 20 peremptory challenges to remove females from the venire. In Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), the Alabama Supreme Court held:
"A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number *804 of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.
"At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of either gender. Instead, Trawick has merely emphasized that the State used many of its strikes to remove women from the venire. Without more, we do not find that the number of strikes the prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination."
698 So.2d at 167-68; see also Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998).
Here, as in Ex parte Trawick, Whitehead relies solely on the fact that 17 of 20 veniremembers struck by the prosecutor were females. He has provided no supporting evidence of a discriminatory intent on the part of the State. In fact, as the State correctly points out in its brief to this court, 9 females served on Whitehead's jury. Additionally, one of the alternate jurors was a female. Whitehead maintains that had the trial court considered the factors set forth in Ex parte Branch, 526 So.2d 609 (Ala.1987), it would have found that a prima facie case of gender discrimination existed. However, the trial court was not afforded the opportunity to make such a determination because Whitehead did not claim gender discrimination at trial. Although Whitehead has raised a claim of gender discrimination on appeal, that is all he has doneraise the claim. He offers this court nothing, other than the number of females struck, to show a prima facie case of gender discrimination in the selection of the jury. These bare statistics are not sufficient to make a prima facie showing of discrimination. See Armstrong v. State, 710 So.2d 531 (Ala.Cr.App.1997); Merriweather v. State, 629 So.2d 77 (Ala.Cr.App.1993).
For the reasons stated above, we find no plain error as to this claim.

III.
Whitehead also contends that the trial court committed reversible error by "precluding [him] from asking prospective jurors whether they would automatically impose a death sentence" for a capital *805 murder conviction. (Issue VI in Whitehead's brief to this court, p. 28.) We find no merit to this claim.
In Bracewell v. State, 506 So.2d 354 (Ala.Cr.App.1986), we addressed this identical issue, and stated:
"Upon proper request, a jury venire in a capital case should be questioned as to whether or not any venireperson has a fixed opinion in favor of capital punishment. The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). `All veniremen are potentially biased. The process of voir dire is designed to cull from the venire persons who demonstrate that they cannot be fair to either side of the case.' Smith v. Balkcom, 660 F.2d 573, 578 (5th Cir. 1981), cert. denied, 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982)(emphasis in original). `A venireman who believes that the death penalty should automatically and in every case flow from conviction of first degree murder must be excused. See Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103 (1919); Crawford v. Bounds, 395 F.2d 297 (4th Cir.1968), cert. denied, 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117 (1970).' Alvord v. Wainwright, 564 F.Supp. 459, 487 (M.D.Fla.1983), affirmed in part, reversed in part on other grounds, 725 F.2d 1282 (11th Cir.), cert. denied, Alvord v. Wainwright, 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984). `It is error to deny the defense the opportunity to seek to determine whether a prospective juror would under no circumstances recommend mercy in the event the defendant is found guilty of the capital crime charged.' 47 Am. Jur.2d Jury § 290 (1969). See also Annot., 48 A.L.R.2d 560, §§ 7 and 11 (1956)."
506 So.2d at 358.
Notwithstanding his contentions to the contrary, Whitehead was not denied the opportunity to question prospective jurors to determine whether any of them would automatically impose the death penalty upon a conviction for capital murder.
The record reveals that the 60-member venire was separated into four panels, each panel consisting of 15 prospective jurors. During the voir dire of the first panel, the following occurred:
"[Whitehead's counsel]: Assuming that you've already sat on the jury, you heard all the evidence, okay? And you, as a whole, all 15 of you, decided this man is guilty of capital murder, okay? You've convicted him already. Now my question is this: Whether or not anyone here automatically, because he's convicted of capital murderhe took the life of a police officer, okay?whether or not that man should automatically get the death penalty? So your response to that is `No, he shouldn't automatically'
"[Prospective juror]: Should not automatically.
"[Whitehead's counsel]: Just because he's been found guilty?
"[Prospective juror]: Right.
"[Whitehead's counsel]: [Prospective juror K.A.]?
"[Prospective juror]: I think this is complicated.
". . . .
"[Whitehead's counsel]: The judge read the indictments yesterday. That is the capital charge, okay? If you find him guilty of any of the counts that he read, then that's capital murder. Okay? He has been convicted of capital murder. In any of those counts, okay? And if you do convict him of capital murder, then, my question is: You've already done that on the counts that the Judge *806 read to you and they included several options: One, whether or not he's a police officer in the line of duty; and whether or not you believe he was a witness under subpoena to testify in another trial
"[Prospective juror]: Well, I can't believe that that would not be considered an aggravating circumstance. See, in my opinion, it should be.
"[Whitehead's counsel]: Okay.
"[Prospective juror]: So I think that I would have to say capital murder for that. But the fact that he was a police officer, I don't think has anything to do with it.
"[Whitehead's counsel]: Okay. Well, let me take that part out of it then, okay, if that bothers you a little bit. If you convict him of capital murder, okay? You sat on a jury and you found him guilty of capital murder, whatever y'all decided that was based on the Judge's instructions, would you then automatically say this man should die because he committed capital murder?
"[Prospective juror]: I believe so.
"[Whitehead's counsel]: Okay.
"The Court: [Whitehead's counsel], I'm going to have to take the question from you even though there is no objection from the State. I don't think the jury is aware enough of the law to make that determination at this point....
"(Court and counsel have the following discussion outside the hearing of the jury panel:)
"[Whitehead's counsel]: Judge, I'm going to object to my not being allowed to ask the jurors whether or not once they convicted this man of capital murder, simply because he was convicted of capital murder, he should automatically vote for the death penalty, especially in light of the fact of the response of [K.A.,] who said that under that circumstance she could only recommend death.
"The Court: I understand your objection, but it is overruled."
(R. 515-19.) The record reveals, however, that before the questioning of panel two, the trial court reversed its decision overruling Whitehead's objection, and allowed Whitehead's counsel to pose the above-quoted question to the remaining three panels of prospective jurors. Furthermore, at the conclusion of the voir dire of the last panel, prior to the empaneling of the jury, the following took place:
"The Court: [Whitehead's counsel], do you want me to bring the first panel back down to let you ask that question concerning the death penalty?
"[Whitehead's counsel]: No, Your Honor.
"The Court: All right, sir. Do you waive that question?
"[Whitehead's counsel]: Yes, sir."
(R. 856.)
Clearly, contrary to Whitehead's contention, Whitehead was not denied the opportunity to ask prospective jurors if they would automatically recommend the death penalty if they convicted him of capital murder. Not only did Whitehead's counsel pose that question to three of the four panels, the trial court gave Whitehead's counsel the opportunity to pose the same question to the first panel; however, counsel declined to do so. If there was any error (and we believe there was none), it was clearly invited by Whitehead.
"`A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own actions.' Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App.1991). `The invited error rule has been applied equally in both capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992). `An invited error is waived, unless it rises to the level of plain error.' Ex parte *807 Bankhead, 585 So.2d 112, 126 (Ala. 1991)."
Williams v. State, 710 So.2d 1276, 1316 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). See also Melson v. State, 775 So.2d 857, 874 (Ala.Cr.App.1999) ("`It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.' Murrell v. State, 377 So.2d 1102, 1105, cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965)."). Whitehead's own failure to question the first panel to determine whether its members would automatically impose the death penalty does not rise to the level of plain error. See Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (no plain error when attorneys for both parties were permitted to question prospective jurors extensively, but jurors on only two of the three panels were asked whether they would automatically vote to impose the death penalty).
Whitehead additionally contends that the trial court committed reversible error in denying him the opportunity to question prospective jurors as to whether they would automatically impose the death penalty for an intentional murder made capital because the victim was a police officer. During voir dire examination, the following took place:
"[Whitehead's counsel]: Let me ask you then in this little bit more specifically[sic]: You did not believe, okay, that a burglary had been committed, okay? You did not believe that this man had been killed because he was a witness against this man or he had been subpoenaed as a witness, okay? I'm removing those things in the indictment that allow you to convict him of capital murder up until only one thing remains, okay? And all you know is that heyou convict him of capital murder, okay, because he was a police officer performing his duty.
"[Prosecutor]: Your Honor, I object. That count has been
"The Court: Sustained. He's not charged with that.
"[Whitehead's counsel]: You are convinced that there's no burglary, okay? And he wasn't killed because of anything that had to do with his official capacity as a police officer, either called as a witness or in any regard. But he was a police officer. You know that because he's a friend of yours. Can you recommend in that case anything other than death?
"[Prosecutor]: Objection.
"The Court: Sustained."
(R. 639-40.)
The trial court properly sustained the State's objections. As the State correctly points out in its brief to this court, Whitehead was not tried for the capital offense of the murder of a police officer while the officer is on duty; he was tried on two counts of the capital offense of the murder of a witness and one count of the capital offense of murder during a burglary.[3] Because Whitehead was not tried for the capital offense of the murder of a police officer on duty, the fact that the victim was a police officer, under the specific questions posed by defense counsel, was irrelevant and could not be used by the jury to impose the death penalty. Under the circumstances presented by Whitehead's counsel's specific questions, there was no capital crime, and, thus, the death penalty would be an inappropriate sentence. Therefore, the questions posed by Whitehead's counsel concerning the veniremembers' views on the death penalty for the murder of a police officer on duty were irrelevant and misleading.

*808 "`"The scope of the voir dire examination of veniremembers is left largely to the discretion of the trial court and will not be disturbed on appeal on the ground that voir dire examination was limited absent an abuse of that discretion. Nodd v. State, 549 So.2d 139 (Ala. Cr.App.1989). The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case. McLeod v. State, 581 So.2d 1144 (Ala.Cr.App.1990)."'"
Hagood v. State, 777 So.2d 162, 176 (Ala. Cr.App.1998), quoting Travis v. State, 776 So.2d 819, 832 (Ala.Cr.App.1997) (quoting, in turn, Smith v. State, 698 So.2d 189, 198-99 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997)) (emphasis added). Defense counsel's question premised on a crime for which Whitehead was not being triedmurder made capital because the victim was a police officer on dutywas not "reasonable under the circumstances of the case." Therefore, the trial court did not abuse its discretion in prohibiting Whitehead from posing this question to the veniremembers.

IV.
Whitehead further contends that the trial court committed reversible error in failing to remove for cause three members of the jury venire who, according to Whitehead, were biased against him. (Issue XIV in Whitehead's brief to this court.) Whitehead claims that the trial court's failure to remove these three jurors for cause forced him to use his peremptory challenges to remove them from the venire and therefore denied him his constitutional right to strike a jury from a pool of fairminded and impartial jurors. Because the arguments Whitehead now makes on appeal were never presented to the trial court, we must review these claims under the plain-error doctrine. See Rule 45A, Ala.R.App.P.
"To justify a challenge for cause, there must be a proper statutory ground or `"some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court."' Clark v. State, 621 So.2d 309, 321 (Ala.Cr.App.1992)(quoting Nettles v. State, 435 So.2d 146, 149 (Ala.Cr.App. 1983)). This Court has held that `once a juror indicates initially that he or she is biased or prejudiced or has deep-seated impressions' about a case, the juror should be removed for cause. Knop v. McCain, 561 So.2d 229, 234 (Ala.1989). The test to be applied in determining whether a juror should be removed for cause is whether the juror can eliminate the influence of his previous feelings and render a verdict according to the evidence and the law. Ex parte Taylor, 666 So.2d 73, 82 (Ala.1995). A juror `need not be excused merely because [the juror] knows something of the case to be tried or because [the juror] has formed some opinions regarding it.' Kinder v. State, 515 So.2d 55, 61 (Ala. Cr.App.1986). Even in cases where a potential juror has expressed some preconceived opinion as to the guilt of the accused, the juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based upon the evidence in the case. Kinder, at 60-61. In order to justify disqualification, a juror `"must have more than a bias, or fixed opinion, as to the guilt or innocence of the accused"`; `"[s]uch opinion must be so fixed ... that it would bias the verdict a juror would be required to render."' Oryang v. State, 642 So.2d 979, 987 (Ala.Cr.App.1993) (quoting Siebert v. State, 562 So.2d 586, 595 (Ala.Cr. App.1989))."
Ex parte Davis, 718 So.2d 1166, 1171-72 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). We now address each of Whitehead's claims individually.

*809 A.
Whitehead contends that prospective juror J.S. should have been removed from the venire for cause because J.S. "knew the victim `well,' ... went to school with the victim, ... worked with the victim,... spoke with the victim on numerous occasions, and ... knew the victim's father." (Whitehead's brief to this court, p. 65.) Whitehead did not present this specific claim to the trial court. Although Whitehead did challenge juror J.S. for cause, the grounds for Whitehead's challenge at trial were that J.S. was "reluctant" to answer certain questions during voir dire, and that "he was less than candid" when he did answer the questions. (R. 864-65.) Whitehead did not state as grounds for his challenge that J.S. knew the victim and the victim's family. Therefore, we review Whitehead's claim on appeal under the plain-error rule. See Rule 45A, Ala.R.App.P.
During voir dire, J.S. stated that he knew the victim well, that he had worked relatively closely with the victim when he was a city councilman and the victim was a police officer, and that he knew the victim's father. However, "the mere fact that a prospective juror is personally acquainted with the victim [or the victim's family] does not automatically disqualify a person from sitting on a criminal jury." Brownlee v. State, 545 So.2d 151, 164 (Ala.Cr.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989). See also McKinney v. State, 654 So.2d 95 (Ala.Cr. App.1995); and Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991). In Harris v. State, 632 So.2d 503 (Ala.Cr.App.1992), aff'd, 632 So.2d 543 (Ala.1993), cert. granted in unrelated part, 512 U.S. 1234, 114 S.Ct. 2736, 129 L.Ed.2d 858 (1994), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), we stated:
"`"The test to be applied is can the juror eliminate the influence of his scruples and render a verdict according to the evidence. Ordinarily a juror is not disqualified where it appears that he is willing to follow the instructions of law given by the trial court and is able to decide the case impartially according to the evidence notwithstanding his scruples. The determination of this question is based on the juror's answers and demeanor and is within the sound discretion of the trial judge. Tidmore [v. City of Birmingham, 356 So.2d 231 (Ala.Cr. App.1977), cert. denied, 356 So.2d 234 (Ala.1978)]. A juror is incompetent whose answers show that he would follow his own views regardless of the instructions of the court. Watwood v. State, 389 So.2d 549, 550 (Ala.Cr. App.), cert. denied, 389 So.2d 552 (Ala. 1980).
"`Barbee v. State, 395 So.2d 1128, 1130-31 (Ala.Cr.App.1981)....
"`"Thus, where a juror states that he has opinions but that he would try the case fairly and impartially according to the law and the evidence and that he would not allow his opinion to influence his decision, it is not error for a trial judge to deny a challenge for cause. Howard v. State, 420 So.2d 828, 831 (Ala.Cr.App.1982). `A juror who brings his thoughts out into the open in response to voir dire questions may be the one who later "bends over backwards" to be fair....' Clark v. State, 443 So.2d 1287, 1289 (Ala.Cr. App.1983)." Mahan v. State, 508 So.2d 1180 (Ala.Cr.App.1986).
"Kinder v. State, 515 So.2d 55, 60-61 (Ala.Cr.App.1986)."
632 So.2d at 520-21.
Here, J.S. stated unequivocally that he could render a fair and impartial verdict regardless of his relationship with the victim and the victim's family. During voir dire examination, before the venire was divided into panels, the following exchange took place:
"[Whitehead's counsel]: Having that close attachment to him and his family, *810 the victim, do you feel like you could sit on a jury and render an impartial verdict based strictly on the evidence?
"[J.S.]: Yes, sir, I do.
"[Whitehead's counsel]: And when Judge Jetton made that statement about [Whitehead's] sitting here innocent, what was the thought that went through your head?
"[J.S.]: That all people are innocent until they are proven guilty.
"[Whitehead's counsel]: And that's the way it should be?
"[J.S.]: Yes, sir."
(R. 283-84.) Later, during voir dire examination of the panels, J.S. responded to further questioning on this subject:
"[Whitehead's counsel]: Well, would you classify the relationship you had with him as a friend, a personal acquaintance that you shared, I guess, common goals with and common beliefs with?
"[J.S.]: I knew [the victim] and we talked and
"[Whitehead's counsel]: And you say that you are not impartial [sic] at all as you sit there about his death?
"[J.S.]: No, sir. As far as the death penalty and a person being convicted on the death penalty, whether it was [the victim] or anybody, I would feel the same way.
"[Whitehead's counsel]: And you can sit there and not be partial at all toward wanting to convict somebody of his murder?
"[J.S.]: As I said, a death is a death. How are you going to distinguish one from the other?"
(R. 828-29.)
It is clear from J.S.'s responses during voir dire examination that he did not have such an absolute bias or fixed opinion that he would have been unable to set his opinions aside and render a fair and impartial verdict based on the evidence. Rather, he was forthcoming about his relationship with the victim and the victim's family and about his ability to prevent that relationship from interfering with his duties as a juror. Thus, we find no plain error in the trial court's failure to remove J.S. from the jury venire.
Furthermore, we note that the trial court did not err in denying Whitehead's challenge for cause as to J.S. on the asserted grounds that J.S. was reluctant to answer questions and was less than candid in his answers. As stated above, it is clear from the record that J.S. was very forthcoming and that he answered all questions put to him. Therefore, the trial court did not err in denying Whitehead's challenge for cause on these grounds.

B.
Whitehead contends that the trial court should have removed prospective juror C.M. for cause, sua sponte, because "her grandfather-in-law and the victim's grandfather were brothers." (Whitehead's brief to this court, p. 65.) Whitehead did not challenge C.M. for cause at trial; therefore, we review this claim under the plain-error rule. See Rule 45A, Ala. R.App.P.
During voir dire examination, C.M. stated that her husband and the victim were distant cousins. She stated that she could not recall ever meeting the victim or members of the victim's immediate family, but that it was possible she had met them at some point during her 31-year marriage. She stated that she could render a fair and impartial verdict, regardless of her husband's relationship to the victim, and that this relationship would have no effect on her ability to make a decision based strictly on the evidence because she had no personal relationship with the victim or his family. "`It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.'" Smith v. State, 581 So.2d 497, 503 (Ala.Crim.App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), quoting Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961). *811 See also Johnston v. State, 497 So.2d 844, 849 (Ala.Cr.App.1986) (a juror "is not disqualified if he states that he can find a true verdict on the evidence alone"); and Stringfellow v. State, 485 So.2d 1238, 1241 (Ala.Cr.App.1986) (a juror who stated that she would "try real hard" to put her personal bias aside was not due to be dismissed for cause). Therefore, the trial court did not err in failing to remove C.M., sua sponte, from the venire.

C.
Whitehead lastly contends that prospective juror M.P. should have been removed, sua sponte, from the venire for cause, because she was related to one of the assistant district attorneys trying the case. Because Whitehead did not challenge M.P. for cause, we may review this claim only for plain error. See Rule 45A, Ala.R.App.P.
M.P. stated during the voir dire examination that her grandmother and Assistant District Attorney Tim Jolley's mother were sisters. Whitehead claims on appeal that this relationship caused M.P. to be biased against him. However, Whitehead has failed to show how M.P. was biased. The voir dire examination of M.P. is conspicuously lacking in questions concerning her ability to disregard her relationship with Assistant District Attorney Jolley and to render a fair and impartial verdict. See Williams, supra, citing Smith, 581 So.2d at 503 ("The party seeking to challenge a juror for cause must show that the questioned juror [was] due to be struck under § 12-16-150, Code of Alabama 1975, or on common law grounds. See Kinder v. State, 515 So.2d 55, 60 (Ala.Cr.App. 1986).").
Furthermore, it is quite clear from the record that Whitehead did not want to remove M.P. from the venire. Immediately following Whitehead's challenges for cause as to other jurors, the trial court pointed out that M.P. was related to Assistant District Attorney Jolley and specifically asked Whitehead's counsel if he wanted to strike M.P. After conferring with Whitehead, Whitehead's counsel declined to challenge M.P. for cause. Assuming that the trial court's failure to remove M.P. sua sponte was error, which we do not believe to be the case, it was invited error.
"`A party cannot assume inconsistent positions at trial and on appeal, and a party cannot allege as error proceedings in the trial court that were invited by him or were a natural consequence of his own actions.' Fountain v. State, 586 So.2d 277, 282 (Ala.Cr.App.1991). `The invited error rule has been applied equally in both capital cases and noncapital cases.' Rogers v. State, 630 So.2d 78 (Ala.Cr.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992). `An invited error is waived, unless it rises to the level of plain error.' Ex parte Bankhead, 585 So.2d 112, 126 (Ala. 1991)."
Williams, 710 So.2d at 1316. Whitehead had the opportunity to challenge M.P. for cause, but refused to strike her. He cannot now claim that the trial court's assent to his express wishes was error.
Moreover, and importantly, Whitehead was not forced to expend one of his peremptory challenges to remove M.P. from the jury. Rather, the State used one of its peremptory strikes to remove M.P. "Having the questionable juror struck by the State left [Whitehead] in a better position than he would have been in had the trial court [removed M.P., sua sponte, for cause], because it left the State with one less strike. Any possible error here would clearly be harmless." Ex parte Jones, 520 So.2d 553, 554 (Ala.), cert. denied, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988). Therefore, the trial court's failure to remove M.P. for cause, sua sponte, was not plain error.

V.
Whitehead contends that the trial court committed reversible error in failing to *812 remove for cause several prospective jurors who, he says, indicated during the voir dire examination that they would automatically impose the death penalty if a defendant was convicted of a capital crime. (Issue XV in Whitehead's brief to this court.) Whitehead specifically claims that prospective jurors R.A., K.A., F.H., M.P., N.S., and L.R. all indicated that they would automatically vote to impose the death penalty if Whitehead was convicted of capital murder. He claims that the trial court's failure to remove these jurors for cause, sua sponte, violated his right to a fair trial and his "rights to the use of peremptory challenges." (Whitehead's brief to this court, p. 68.) Whitehead's claims with respect to these six prospective jurors must be reviewed under the plain-error doctrine because none of the jurors was challenged for cause at trial. See Rule 45A, Ala.R.App.P.
In Taylor v. State, 666 So.2d 36 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), we stated:
"`A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)(footnote omitted). On the other hand, "[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). Accord, Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App.1986).'
"Kuenzel v. State, 577 So.2d 474, 484-5 (1990), affirmed, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
"`The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.'"
666 So.2d at 46-47.
Whitehead claims that six prospective jurors indicated during voir dire examination that they would automatically impose the death penalty if he was convicted of capital murder. However, other than mere citations to the record, he provides no argument in support of his contentions. After a careful review of the voir dire of these jurors, we find that, contrary to Whitehead's assertion, none of the six prospective jurors Whitehead now challenges indicated opinions in favor of the death penalty so fixed as to substantially impair the performance of their duties as jurors. We address each challenged juror in turn.

A.
Whitehead cites the following exchange in support of his argument that the trial court should have removed R.A. from the venire, sua sponte, because of his views on capital punishment:

*813 "[Whitehead's counsel]: [R.A.], assuming that this entirethat you sat on the jury, okay, and you convicted Mr. Whitehead, okay, of the charges as the Judge read them out that a police officer was killed and that you believe that he would be a witnesshad been subpoenaed and you believe that a burglary had been in progress when he was killed. Is there any set of circumstances where you could rule or render a recommendation to the Court of life [imprisonment] without [parole] as opposed to the death penalty?
"[R.A.]: No. Not really.
"[Whitehead's counsel]: There's not? Okay. So, there's no situation where you would recommend the death penalty?
"[R.A.]: Well, an officer got killed, I'm sorry for him, you know. The way I look at it, it's his time to go."
(R. 510-11.)
Immediately following this confusing exchange, the trial court briefly interrupted the questioning by Whitehead's counsel and instructed veniremembers as follows:
"Ladies and gentlemen, I'm going to have to give you further instruction on this question. His question is a little confusing. I'm going to allow it, but I'm going to tell you a little more about it. Now, I will at the end of the trial, if you find the defendant guilty and if we go into the sentencing stage, then I will define and enumerate the aggravating circumstances that you are to consider. I will also define and enumerate the mitigating circumstance. I tell you now that the murder of a police officer is not an aggravating circumstance. The murder of a witness is not an aggravating circumstance. So if in your deliberation in your sentencing phase if you find that there are no aggravating circumstances, then you would not be able to recommend death. The only sentence you would be able to recommend would be life without the possibility of parole.
"Now, if there is one or more aggravating circumstances then you would weigh that against the mitigating circumstances. Not the number of them but just which one had the greater weight. And if you found that the mitigating circumstances outweighed the aggravating, then again your duty would be to recommend life without the possibility of parole."
(R. 511-12.) After this instruction, the following occurred:
"[Whitehead's counsel]: Thank you, Your Honor. Ladies and gentlemen, I'm going to be frank with you about why I ask that particular question. It's my duty to determine whether or not there are any veniremembers who want to vote for the death penalty to somebody just because they are guilty of capital murder. Okay. That's as simple as it gets. So, I'll go and ask each one of you. I know [R.A.] has alreadyyes, sir?
"[R.A.]: Yes. I don't feel that we should be in that predicament right now because we haven't heard a thing to do with this case. We shouldn't be in a predicament to say well, `Yeah, I could do that,' you know. As far as me, that's just the way I feel. I haven't heard a thing about it. I couldn't say, `Yeah, I could' or `Yeah, I couldn't' till I heard exactly what went on.
"[Whitehead's counsel]: Okay. So I guess your response to my question would be no, you would not automatically recommend death for somebody
"[R.A.]: Exactly.
"[Whitehead's counsel]:convicted of capital murder?
"[R.A.]: Exactly. I'd just have to hear everything."
(R. 512-13.)
Before either of the above-quoted exchanges with defense counsel, R.A. had responded to the State's questioning as follows:
"[Prosecutor]: What I want to ask you at this point in time is how you feel *814 about the death penalty, what are your personal feelings about the death penalty? [R.A.]?
"[R.A.]: I believe in the death penalty, you know, if they've gone out and committed four or five murders. As far as one murder, you know, I don't believe in the death penalty.
"[Prosecutor]: The law in Alabama defines certain offenses that are classified as capital offenses. Most of those are offenses that are in connection with something else. Murder while you are committing a burglary, a double murder is just a couple of examples. A murder while committing a rape, committing a robbery, this sort of thing. Are you sayingdid I possibly hear you say that you would not feel like a death penalty would be appropriate if the capital offense was committed and it was the first time somebody killed somebody?
"[R.A.]: No. I wouldn't feel the death penalty would be necessary."
(R. 425-26.)
After looking at the entire questioning of R.A., it is clear that R.A. did not express a belief that the death penalty should automatically be imposed for all capital murders. R.A.'s single answer to a confusing question posed by Whitehead's counsel cannot be viewed in isolation to determine whether R.A. had a fixed opinion on the death penalty. In determining whether a juror should have been removed from the venire for cause, "`this court will look to the questions propounded [to] and the answers given by the prospective juror to see if [the trial court's] discretion was properly exercised.'" Morrison v. State, 601 So.2d 165, 168 (Ala.Crim.App.1992), quoting Alabama Power Co. v. Henderson, 342 So.2d 323, 327 (Ala.1976). "These questions and answers must be viewed as a whole and not in isolation." Id. Taken as a whole, R.A.'s answers during voir dire did not indicate that he would automatically impose the death penalty if Whitehead was convicted of capital murder. Therefore, the trial court's failure to remove R.A. from the venire, sua sponte, was not error, much less plain error.
Moreover, Whitehead was not forced to expend one of his peremptory challenges to remove R.A. from the jury; the State used one of its peremptory strikes against R.A. Thus, any error was harmless. See Jones, supra.

B.
Whitehead cites the following exchange to support his claim that prospective juror K.A. indicated that she would automatically impose the death penalty upon a defendant convicted of capital murder:
"[Whitehead's counsel]: Assuming that you've already sat on the jury, you heard all the evidence, okay? And you, as a whole, all 15 of you, decided this man is guilty of capital murder, okay? You've convicted him already. Now, my question is this: Whether or not anyone here automatically, because he's convicted of capital murderhe took the life of a police officer, okay?whether or not that man should automatically get the death penalty? ...
"[K.A.]: I think this is complicated.
"[Whitehead's counsel]: I know it is.
"[K.A.]: I think that it would not matter if the victim was a police officer. I would not automatically recommend death. And when you are saying capital murder, and that's like two crimesto get capital murder, it has to be a murder during a crime. And I think maybe for that, it would be automatically the death penalty. But not necessarily for any murder or not necessarily because it was a police officer.
"[Whitehead's counsel]: The Judge read the indictments yesterday. That is the capital charge, okay? If you find him guilty of any of the counts that he read, then that's capital murder. Okay? He has been convicted of capital murder. In any of those counts, okay? And if you do convict him of capital murder, *815 then, my question is: You've already done that on the counts that the Judge read to you and they included several options: One, whether or not he's a police officer in the line of duty; and whether or not you believe he was a witness under subpoena to testify in another trial
"[K.A.]: Well, I can't believe that that would not be considered an aggravating circumstance. See, in my opinion, it should be.
"[Whitehead's counsel]: Okay.
"[K.A.]: So I think that I would have to say capital murder for that. But the fact that he was a police officer, I don't think has anything to do with it.
"[Whitehead's counsel]: Okay. Well, let me take that part out of it then, okay, if that bothers you a little bit. If you convict him of capital murder, okay? You sat on a jury and you found him guilty of capital murder, whatever y'all decided that was based on the Judge's instructions, would you then automatically say this man should die because he committed capital murder?
"[K.A.]: I believe so.
"[Whitehead's counsel]: Okay."
(R. 515-18.) At this point, the trial court interrupted Whitehead's counsel and posed the following question to the venire: "Is there anyone on this panel that would not follow the instruction of the law as I give it to you at the end of the trial?" (R. 518.) All the jurors, including K.A., indicated that they would follow the instructions of the trial court.
Furthermore, during individual voir dire, K.A. stated:
"Maybe I should clarify. I feel like, and I don't know, but if you intentionally kill somebody in the act of, you know, to rob them because they are a witness or whatever, I think the death penalty is a fair judgment. But at the same time, Judge Jetton said you have to follow what the Court orders you. And I could do that. I mean I understand that."
(R. 532-33.) As we stated above, "`[t]he crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Taylor, 666 So.2d at 47, quoting Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). K.A. clearly indicated that she would follow the trial court's instructions during the sentencing phase of the trial. Therefore, there was no error, plain or otherwise, in the trial court's failure to remove K.A., sua sponte, from the venire.
Moreover, Whitehead was not forced to expend one of his peremptory challenges to remove K.A. from the jury; the State used one of its peremptory strikes against K.A. Thus, as was the case with prospective juror R.A., any error would be harmless error. See Jones, supra.

C.
Whitehead contends that prospective juror F.H. stated during voir dire that she would automatically impose the death penalty for a capital murder conviction and, therefore, that the trial court should have removed her, sua sponte, from the venire for cause. Again, Whitehead provides no support for this claim other than a mere citation to the record. Whitehead's citation to the record reflects F.H.'s isolated response to the prosecutor's question whether she could follow the trial court's instructions and vote for the death penalty in an appropriate situation. In response, F.H. stated: "Well, I would weigh the evidence and if I believed the defendant to be guilty, I would vote that way, yes." (R. 569.) This statement in no way reflects an opinion that the death penalty should be imposed for all capital murder convictions. Rather, it indicates that F.H. would follow the trial court's instructions and, in an appropriate situation, would vote for the death penalty. F.H. clarified this view later during voir dire when she specifically stated, in response to a question by Whitehead's *816 counsel, that she could vote for something other than the death penalty in a capital case if the situation was appropriate. After looking at the entire voir dire examination of F.H., we find no merit in Whitehead's claim that F.H. should have been removed from the venire based on her expressed views on the death penalty. We find no error as to this matter.
Moreover, as was the situation with prospective jurors R.A. and K.A., Whitehead was not forced to expend a peremptory challenge to remove K.A. from the venire; the State used one of its peremptory strikes against F.H. Thus, if error occurred, it was harmless. See Jones, supra.

D.
Whitehead also challenges prospective juror M.P., claiming that she, too, indicated during voir dire that she would automatically impose the death penalty upon a conviction for capital murder. Whitehead's citation to the record in support of this claim is to the following exchange:
"[Whitehead's counsel]: Okay. [M.P.]?
"[M.P.]: I would just like to
"[Whitehead's counsel]: You could recommend something other than death if you found somebody guilty of capital murder?
"[M.P.]: No. Probably not. I don'tI don't know.
"[Whitehead's counsel]: Okay. Well, that's
"[M.P.]: It'd be hard.
"[Whitehead's counsel]: Let's talk about that a little further, please. Assume for a minute that you sat on the jury in this case and that you believed the evidence and were reasonably convinced beyond a reasonable doubt that Mr. Whitehead was guilty of murder, capital murder. Could you recommend any other sentence other than death?
"[M.P.]: No. I guessI guess not."
(R. 733-34.) M.P.'s responses indicated an uncertaintynot a fixed opinion, as Whitehead claimsas to whether the death penalty should automatically be imposed for a conviction of a capital crime. Furthermore, before this exchange, M.P. stated during questioning by the prosecutor that although she believed in the death penalty, she "personally couldn't vote for it." (R. 687.) Clearly, M.P. did not have a fixed opinion on the death penalty, and there was no plain error in the trial court's failure to remove her, sua sponte, from the venire.
We also note that, as with the majority of other prospective jurors that Whitehead challenges in this regard, M.P. was removed from the venire with a peremptory strike by the State; thus, any error was harmless. See Jones, supra. Further, Whitehead was given the opportunity by the trial court to remove M.P. from the venire because she was related to the prosecutor by marriage. After conferring with Whitehead, Whitehead's counsel informed the trial court that he did not wish to challenge M.P. for cause. (See Part IV.C. of this opinion.) For these reasons, Whitehead is not entitled to relief on this claim.

E.
Whitehead's citation to the record regarding prospective juror N.S. reveals the following exchange:
"[Whitehead's counsel]: [N.S.], same question. If you're sitting on a jury and you find Mr. Whitehead, from the evidence, to be guilty of capital murder as the Judge defined it, would you in every instance recommend death?
"[N.S.]: No. As the Judge defines it now.
"[Whitehead's counsel]: You say, `As the Judge defines it now.' Prior to his explanation of mitigating circumstances and all of that, did you feel like that in a situation where somebody is guilty of capital murder that they should automatically get the death penalty?

*817 "[N.S.]: Prior to his better explanation. It would have to be really overwhelming to be death penalty.
"[Whitehead's counsel]: Meaning overwhelming if you convicted him of capital murder?
"[N.S.]: Snowed under with guilt."
(R. 822-23.) Clearly, contrary to Whitehead's contention, N.S. never stated or implied that she would automatically recommend the death penalty for a conviction of capital murder. Therefore, there was no error, plain or otherwise, as to this claim.

F.
Finally, Whitehead contends that prospective juror L.R. should have been removed from the venire for cause because, he says, she indicated during voir dire that she too would automatically impose the death penalty upon a capital murder conviction. Contrary to Whitehead's assertion, however, L.R. indicated on two occasions that she would follow the trial court's instructions on aggravating and mitigating circumstances before making a sentencing recommendation. In addition, she specifically stated that if there were no aggravating circumstances, she would recommend life imprisonment without the possibility of parole. Although L.R. stated that she believed in the death penalty, such a belief does not translate into a fixed opinion that death should always be the punishment imposed for capital murder convictions. Therefore, the trial court did not commit plain error in failing to remove L.R., sua sponte, from the venire.
Moreover, Whitehead was not forced to expend a peremptory challenge to remove L.R. from the venire; the State used one of its peremptory strikes against L.R. Thus, if error occurred, it was harmless. See Jones, supra.

VI.
Whitehead contends that the jury selection process in Marshall County denied him his Sixth Amendment right to have a grand jury and a petit jury selected from a fair cross-section of the community. (Issue XVI in Whitehead's brief to this court.) He claims that "black people were systematically underrepresented on [his] grand [and petit] jur[ies]," thereby denying him his constitutional rights. (Whitehead's brief to this court, pp. 69-70.) Because this claim was never presented to the trial court, we may only review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
"`In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'"
Ex parte Land, 678 So.2d 224, 244 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979). The State concedes that Whitehead has satisfied the first prong of the above-quoted Duren testi.e., that blacks are a "distinctive" group in the community. However, as the State correctly argues, Whitehead has failed to satisfy the remaining two prongs of Duren.
As to the second prongthat the representation of blacks in venires in Marshall County is not fair and reasonable in relation to the number of blacks in the communityWhitehead merely states that "there were no black people on his jury venire," and that "the representation of black people on the grand jury list and on the list from which [his] jury was selected is not fair and reasonable in relation to the number of people in the community." (Whitehead's brief to this court, pp. 69-70.) *818 He has provided no evidence as to the percentage of blacks in Marshall County as compared to the percentage of blacks on his venire. Furthermore, his claim that there were no blacks on his venire is belied by the record. The record indicates that three members of the venire were black. Although no blacks ultimately sat on his petit jury, "it is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen." Travis v. State, 776 So.2d 819, 838 (Ala.Cr.App.1997).
As to the third prong of Duren that the underrepresentation on the defendant's jury venire is due to systematic exclusion of the group in the jury selection processWhitehead makes no cognizable argument. He merely states that "the underrepresentation resulted from an improper method of selection." (Whitehead's brief to this court, p. 70.) Whitehead does not state what method of selection was used in his trial or in the trials of others in Marshall County, or how that method was "improper." However, it appears from the record that the method of selecting Whitehead's venire was by random selection from a list of licensed drivers in Marshall County. "`"Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury."'" Travis, 776 So.2d at 836, quoting Stanton v. State, 648 So.2d 638, 641 (Ala.Cr.App.1994).
"`"The third Duren ... element that there has been a systematic exclusion of a distinctive groupconstrains a defendant to establish that `the cause of the underrepresentation was ... inherent in the particular jury-selection process utilized.' Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d [147, 149 (Ala.Cr.App.1993)]. Additionally, "with regard to the second and third Duren elements, a defendant asserting a fair cross-section violation `must demonstrate ... not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.' Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir.1986)." Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no showing either that random computerized selection of licensed drivers inherently results in underrepresentation of blacks on jury venires in [Marshall] County or that blacks had been underrepresented on other venires in [Marshall] County.'"
Travis, 776 So.2d at 838. Therefore, there was no plain error as to this issue.

VII.
Whitehead contends that his convictions for two counts of the capital murder of Andrew Whitten under § 13A-5-40(a)(14), Ala.Code 1975, violated his right to be free from double jeopardy. (Issue IV in Whitehead's brief to this court.) Whitehead was convicted under § 13A-5-40(a)(14) of one count of the murder of a witness who had testified before the grand jury and of one count of the murder of a witness who had been subpoenaed to testify at a criminal trial. Whitehead did not present this claim to the trial court; therefore, we will review it under the plainerror rule. Rule 45A, Ala.R.App.P.
In our opinion affirming the convictions and death sentence of Whitehead's codefendant, James Matthew Hyde, we stated the following in rejecting the identical claim:
"The United States Supreme Court has explained the purpose of the Double Jeopardy Clause as follows:
"`It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense.'
"North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). `The Double *819 Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). In this case, the appellant was not prosecuted a second time for the same offense after an acquittal or after a conviction. Therefore, we must determine only whether the appellant is being punished multiple times for the same offense or is receiving a greater punishment than the legislature intended. Because this case involved the death penalty, the appellant cannot be punished twice for the same offense. He `has only been sentenced to die once, and indeed, can only be put to death once.' Ex parte McWilliams, 640 So.2d 1015, 1022 (Ala.1993). Furthermore, even if the appellant's right to be free from double jeopardy was violated by the two convictions for the murder of a single witness, any error is harmless. If one conviction for the murder of a witness was void, the convictions for the other count of murder of a witness and for murder during a burglary would remain, and either conviction would be sufficient to support a death sentence. Id."
Hyde v. State, 778 So.2d 199, 211 (Ala.Cr. App.1998). See also Arthur v. State, 711 So.2d 1031 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997).
Here, as in Hyde, Whitehead was not prosecuted a second time after either an acquittal or a conviction. Nor did he receive separate sentences for the same offense. Whitehead "has only been sentenced to die once and, indeed, can only be put to death once." Ex parte McWilliams, 640 So.2d 1015 (Ala.1993). Furthermore, even assuming that Whitehead's convictions for two counts of capital murder under § 13A-5-40(a)(14) violated his double jeopardy rights, any error, as in Hyde, would be harmless because even if "one conviction for the murder of a witness was void, the convictions for the other count of murder of a witness and for murder during a burglary would remain, and either conviction would be sufficient to support a death sentence." Hyde, 778 So.2d at 211.
Whitehead also claims that, as a result of his two capital murder convictions under § 13A-5-40(a)(14), he was denied a fair trial and a reliable sentencing determination because, he says, "it is impossible to determine how the two convictions affected the jury's weighing of aggravating circumstances." (Whitehead's brief to this court, p. 25.) Whitehead did not raise this claim in the trial court; therefore, we must review it pursuant to the plain-error rule. Rule 45A, Ala.R.Crim.P. We find no merit to Whitehead's claim.
The record reveals that the jury was properly instructed on the aggravating circumstances it could consider and the process to be used in weighing the aggravating and mitigating circumstances found to exist in the case. The fact that the murder victim was a witness, both a witness who had testified in a criminal proceeding and a witness who had been subpoenaed to testify in a criminal proceeding, is not an aggravating circumstance for the jury's consideration in determining the proper sentence under § 13A-5-49, Ala.Code 1975. The jury was instructed accordingly, and jurors are presumed to follow the instructions of the trial court. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App.), aff'd, 666 So.2d 73 (Ala. 1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). We note that in its sentencing order, the trial court stated that it was fully aware that the murder of a witness was not an aggravating circumstance provided for in § 13A-5-49, and that it had considered only the aggravating circumstances provided for by statute in reaching its sentencing determination. (C. 286.) Accordingly, we find no plain error as to this issue.

*820 VIII.
Whitehead also contends that the trial court committed reversible error in admitting into evidence "several statements" he made before his trial, including a statement to a police officer, a statement to his parole officer, and his testimony at the trial of his codefendant Matthew Hyde. (Issue XI in Whitehead's brief to this court, p. 57.) In support of these claims, Whitehead provides nothing more than citations to the record and conclusory statements; he makes no argument and points to no facts to support his claims. In addition, at his trial, Whitehead failed to object to the introduction into evidence of the alleged statement to his parole officer and to the introduction of his testimony from Hyde's trial. Although Whitehead's failure to object does not preclude us from reviewing his present allegations, it does weigh against him as to any claims of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).

A.
Whitehead first contends that the trial court erroneously admitted into evidence a statement that he made to Officer James Maze on May 12, 1996, two days before Whitehead testified at Hyde's trial. Whitehead claims that "[i]t is clear from the evidence that the State did not adequately advise [him] of his rights" before he made this statement. (Whitehead's brief to this court, p. 58.) Because Whitehead's motion to suppress this statement did not contain the grounds he now raises on appeal, we may review this claim only for plain error. Rule 45A, Ala.R.App.P.
"Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala.1985). For a confession to be properly admitted, the State must prove that `"the defendant was informed of his Miranda [v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] rights and that the confession was voluntarily given."' Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App.1996)(quoting Mann v. State, 581 So.2d 22, 23 (Ala.Cr.App. 1991)).
"`"In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala.Cr.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence."'
"Howard v. State, 678 So.2d 302, 306 (Ala.Cr.App.1996)(quoting Dixon v. State, 588 So.2d 903, 907 (Ala.1991))."
Maples v. State, 758 So.2d 1, 41 (Ala.Cr. App.1999). In addition, when determining whether a confession is voluntary, a court must look at the totality of the circumstances surrounding the confession. Id.; see also McLeod v. State, 718 So.2d 727 (Ala.1998).
Looking at the totality of the circumstances, we conclude that Whitehead's confession to Officer Maze was clearly voluntary. At trial, but out of the hearing of the jury, Officer Maze testified that he received a telephone call at his home on the evening of May 12, 1996, informing him that Whitehead wanted to speak with an investigator. Officer Maze stated that he went to the jail and confirmed that Whitehead wanted to speak with him. Officer Maze then read Whitehead his Miranda rights. Whitehead placed his initials on the rights form and then signed a waiver. Officer Maze further testified that he did not promise Whitehead anything and that he did not threaten or coerce him into confessing. He also stated that Whitehead appeared to understand his rights and he did not appear to be under *821 the influence of drugs or alcohol. At that point, according to Officer Maze, Whitehead confessed to shooting Whitten, stating that James Matthew Hyde and Steven Brookshire, his codefendants, had no involvement in the shooting. The trial court determined that Whitehead's confession to Officer Maze was made knowingly and voluntarily, without inducement or coercion. We agree.
Contrary to Whitehead's assertion, Whitehead was fully advised of his constitutional rights before he confessed. Officer Maze informed Whitehead of his Miranda rights and obtained a voluntary waiver of those rights from Whitehead. Furthermore, Whitehead himself initiated the contact with Officer Maze, expressing a desire to make a statement. We find that the trial court's finding of voluntariness was not "manifestly contrary to the great weight of the evidence"; therefore, we find no error, plain or otherwise, as to this claim.

B.
Whitehead also contends that the trial court erred to reversal by admitting into evidence "a statement he allegedly gave to his parole officer." (Whitehead's brief to this court, p. 57.) After a thorough review of the record, we can find no indication of any statement to a parole officer. Whitehead's citation to the record in support of this claim reveals a statement made by Whitehead to the victim, Whitten, concerning the theft case against Whitehead that Whitten was investigating when he was murdered. In this statement, a transcribed copy of which was admitted into evidence at trial and to which Whitehead's counsel stated that he had no objection, Whitehead denied the theft charges, but admitted to clocking in and out of work without actually working on seven occasions. Whitehead's alleged admission to Whitten was referred to at trial by Whitehead's counsel, who attempted to use the alleged admission to rebut the State's evidence of motive. After reviewing the statement, and the circumstances surrounding its making, we find no error, plain or otherwise, in its admission.

C.
Finally, Whitehead contends that the trial court committed reversible error in admitting into evidence a tape recording and a transcript of his testimony at James Matthew Hyde's trial. At Hyde's trial, Whitehead testified under oath that he shot Whitten, that Hyde and Brookshire knew nothing of the shooting until after it occurred, and that after the murder, he threatened to kill Hyde and Brookshire to keep them from going to the police about the shooting. On appeal, Whitehead contends that his testimony from Hyde's trial was inadmissible at his own trial because, he says, his prior testimony was not voluntary and he had not been advised of his Miranda rights before testifying. At his trial, Whitehead did not object on these grounds to the introduction of his testimony from Hyde's trial; therefore, we may review his claims on appeal only pursuant to the plain-error rule. Rule 45A, Ala. R.App.P.
It is well settled that "a defendant's testimony at a former trial is admissible in evidence against him in later proceedings." Ashurst v. State, 462 So.2d 999, 1008 (Ala.Cr.App.1984). The admission into evidence of prior testimony is not in contravention of the right against self-incrimination. Ex parte Godbolt, 546 So.2d 991 (Ala.1987). Only "where the former testimony was given at a hearing where the accused was denied his right to the assistance of counsel, People v. Martin, 21 Mich.App. 667, 176 N.W.2d 470 (1970), or where the former testimony was `impelled' in order to rebut evidence introduced against the accused in violation of his constitutional rights, Harrison [v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968)]," is this general rule inapplicable. Ashurst, 462 So.2d at 1008.
*822 Here, "the record ... clearly shows that [Whitehead] intelligently waived his constitutional right to remain silent. [He] voluntarily took the stand and testified [at his co-defendant's trial] under the guidance and supervision of his counsel and in the presence of and under the protection of the trial court." Ex parte Godbolt, 546 So.2d at 996. Whitehead was not "impelled" to testify to rebut evidence against him, nor was he denied the right to assistance of counsel. In fact, the record shows that Whitehead's counsel advised him not to testify at Hyde's trial, advice that Whitehead chose not to follow. (C. 320-21.) Thus, we find no error, plain or otherwise, in the admission into evidence of Whitehead's prior testimony.
Whitehead's claim that he was not adequately advised of his Miranda rights prior to his testimony at Hyde's trial is equally unavailing. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), applies only to custodial interrogations. His testimony at Hyde's trial was not a custodial interrogation.

IX.
Whitehead also contends that the trial court erred in allowing the State to elicit testimony concerning his post-arrest silence, in violation of Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). (Issue VIII in Whitehead's brief to this court.) Whitehead specifically objects to a comment made at trial by Detective Tommy Cole, the chief of detectives of the Albertville Police Department and a lead investigator in Whitten's murder. During Cole's direct examination by the prosecutor, as Cole was testifying concerning his investigation of the case, the following occurred:
"[Prosecutor]: Let me stop you just a second. At the point in time that you picked up Mr. Whitehead, was he placed under arrest?
"[Cole]: I was not present when he was actually placed under arrest, when he was taken into custody in Etowah County, but they transferred him to the Albertville City Jail.
"[Prosecutor]: Was he placed under arrest?
"[Cole]: He was in the city jail when I arrived, yes sir.
"[Prosecutor]: Charged with what?
"[Cole]: Murder.
"[Prosecutor]: Had James Matthew Hyde and Stephen Brookshire [Whitehead's codefendants] been placed under arrest?
"[Cole]: They had.
"[Prosecutor]: For what?
"[Cole]: Murder.
"[Prosecutor]: I asked you if you continued with the investigation even though you had these individuals in custody and had them placed under arrest.
"[Cole]: Yes.
"[Prosecutor]: Would you tell us how that investigation continued?
"[Cole]: At that point, I attempted to interview Mr. Larry Whitehead and he wouldn't talk to us without his lawyer. He said he didn't have anything to say to us.
"[Prosecutor]: Then what happened?
"[Cole]: We transferred him on to the Marshall County jail later that day and continued the investigation on. Later talked to Angela Whitehead, his sister-in-law.
"[Prosecutor]: Did you talk to other individuals?
"[Cole]: Yes, sir.
"[Prosecutor]: Who were these?"
(R. 1064-65.) Cole continued to testify concerning his investigation of Whitten's murder. As the above-quoted portion of the record reveals, Whitehead did not object to Cole's comment that he now claims was reversible error. Thus, we will review his claim pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.
In addressing a claim similar to Whitehead's, we stated the following in Wilkerson *823 v. State, 686 So.2d 1266 (Ala.Cr.App. 1996):
"In Greer v. Miller, 483 U.S. 756, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), the United States Supreme Court `clarified that "the holding of Doyle is that the Due Process Clause bars `the use for impeachment purposes' of a defendant's postarrest silence."` United States v. Stubbs, 944 F.2d 828, 834 (11th Cir. 1991), quoting Greer, 483 U.S. at 763, 107 S.Ct. at 3108, in turn quoting Doyle, 426 U.S. at 619, 96 S.Ct. at 2245. Furthermore, `while a single comment alone may sometimes constitute a Doyle violation, the Supreme Court's opinion in Greer makes clear that a single mention does not automatically suffice to violate defendant's rights when the government does not specifically and expressly attempt to useas was attempted in Doyle and Greerthe improper comment to impeach the defendant. See Lindgren v. Lane, 925 F.2d 198, 201 (7th Cir.1991).' Stubbs, 944 F.2d at 835. (Emphasis in original.) In Lindgren, supra, the United States Court of Appeals for the Seventh Circuit found as follows: `At trial the prosecutor never called attention to the petitioner's silence. The defendant simply responded that he didn't "wish to say any more" at the tail end of a compound answer to a question by the police officer. Consequently, no Doyle violation occurred.' 925 F.2d at 201. See also Mathenia v. Delo, 975 F.2d 444, 452 (8th Cir.1992), cert. denied, 507 U.S. 995, 113 S.Ct. 1609, 123 L.Ed.2d 170 (1993) (testimony by officer that defendant did not make a statement to him at the time of his arrest not a comment on defendant's post-arrest silence because the testimony was `"merely preliminary to the admission into evidence of [Mathenia's] videotaped statement"'); Rowan v. Owens, 752 F.2d 1186, 1190 (7th Cir.1984), cert. denied, 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 691 (1986) (testimony by officers that defendant stated `he didn't want to say anything else' at conclusion of interrogation not a comment on defendant's post-arrest silence because it simply indicated the end of the interrogation and the testimony was not emphasized so `as to invite the jury to infer that [the defendant] had decided to "clam up" after realizing he was incriminating himself').
"Our review of the record reveals that the comment by Officer Wilkinson to which the appellant objects was never mentioned or alluded to again at trial by the prosecutor. The statement was not specifically elicited by the prosecutor and appears to be nothing more than part of Officer Wilkinson's narrative of the events leading to the making of the appellant's third taped statement. Clearly, the comment did not constitute an improper comment on the appellant's post-arrest silence for purposes of Doyle."
686 So.2d at 1272-73.
Here, as in Wilkerson, the comment made by Cole was not emphasized when it was made, nor was it mentioned or alluded to again by the prosecution. Moreover, the comment was not "specifically elicited" by the prosecutor, but instead appears to be nothing more than a portion of Cole's testimony of the circumstances surrounding his investigation of Whitten's murder. For purposes of Doyle, we do not find that Cole's comment on Whitehead's post-arrest silence was improper. Thus, we find no plain error as to this issue.

X.
Whitehead contends that the trial court erred by permitting the State to introduce evidence of several alleged prior bad acts. (Issue XIII in Whitehead's brief to this court.) Whitehead specifically claims that the State improperly elicited testimony that he had threatened to kill his accomplice, James Matthew Hyde; that he was in possession of a rifle and ammunition when he was arrested; that he was charged with violating his parole; and that *824 he had allegedly robbed a church in Albertville. Other than mere citations to the record and general claims that evidence of these alleged prior bad acts was irrelevant and prejudicial, Whitehead provides us with no argument in support of his contentions. Furthermore, Whitehead did not timely object when the State introduced evidence of these alleged prior bad acts; therefore, we may review these claims only under the plain-error rule. Rule 45A Ala. R.App.P.

A.
First, Whitehead contends that the trial court erroneously permitted Christina Phelphs to testify to the effect that she had heard Whitehead threaten to kill his codefendant James Matthew Hyde if Hyde testified against him at his parole revocation hearing. Whitehead did not object to this testimony at trial; thus we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
Whitehead provides no argument for this claim, other than a mere citation to the record. The cited portion of the record reads as follows:
"[Prosecutor]: All right. Was ... Whitehead present during any conversation that you had with [Hyde] or [Brookshire] regarding their testimony at the parole revocation hearing?
"[Phelphs]: Uh
"[Prosecutor]: Or do you know?
"[Phelphs]: The only thing that I can remember said was the day that [Whitehead] said he was going to kill [Hyde] if [Hyde] testified against him. He said that to [Hyde's brother]."
(R. 1310.) Whitehead contends that this statement by Phelphs, which was unresponsive to the prosecutor's question, was irrelevant and highly prejudicial to his case. We disagree.
At trial, the State's theory of the case was that Whitehead murdered Whitten to prevent Whitten from testifying against him in the Hudson Foods theft case so that he would not be convicted of the theft charges and sentenced as a habitual felony offender to life imprisonment, and so that he could file what he thought would be a multimillion-dollar civil lawsuit against Hudson Foods. Numerous witnesses testified at Whitehead's trial that Whitehead planned to kill Whitten for these reasons. As a result of Whitten's investigation of the Hudson Foods matter, a parole revocation hearing was held several months before Whitten's murder and approximately one month before Whitehead was indicted for theft. Although Whitehead's parole was ultimately not revoked for his involvement in the Hudson Foods matter, evidence of Whitten's investigation of Whitehead for theft and the circumstances surrounding the parole revocation hearing, including Whitehead's threat toward Hyde to prevent Hyde from testifying at the revocation hearing, was relevant and probative as tending to support the State's theory that Whitehead's motive for killing Whitten was to prevent, at all costs, a subsequent conviction for theft of property in the first degree. Whitehead threatened to kill Hyde for essentially the same reason that he had murdered Whitten: to prevent Hyde, who had clocked Whitehead in and out of work on several occasions, from testifying against him concerning the theft case. While we recognize that Whitehead's threat toward Hyde on this occasion was to prevent his testimony at the parole revocation hearing, rather than at the trial for the actual theft, we believe the import to be the same; therefore, the threat was both relevant and probative to support the State's theory of Whitehead's motive for killing Whitten.
"`"`Testimony going to show motive, though motive is not an element of the burden of proof resting on the state, is always admissible.' ... Even slight evidence to show motive for doing the act in a criminal case is not to be excluded, but should be left to the consideration of the jury."'" Siler v. State, 705 So.2d 552, *825 556-57 (Ala.Cr.App.1997), quoting Giddens v. State, 565 So.2d 1277, 1281 (Ala.Cr.App. 1990).
In addition, we note that the State also properly introduced evidence that Whitehead had threatened to kill Hyde on other occasions as well. At Hyde's trial, Whitehead testified for the defense in what was an apparent attempt to help his codefendant obtain an acquittal, or at least to avoid the death penalty, for Whitten's murder. Whitehead testified that he, not Hyde, killed Whitten and then, on at least two occasions after the murder, threatened to kill Hyde to keep Hyde from informing the police and from testifying against him in the event he was tried for Whitten's murder. Whitehead's testimony from Hyde's trial was properly read into the record at his own trial. (See Part VIII.C. of this opinion, where we held that Whitehead's prior testimony was properly admitted into evidence.)
Even assuming Phelphs's testimony was improper, "[t]estimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." Travis, 776 So.2d at 861. Although Whitehead's threat to kill Hyde if he testified against him at the parole revocation hearing was made in a different context than were the threats Whitehead made against Hyde in relation to Whitten's murder, the evidence that Whitehead had threatened to kill Hyde made in relation to the parole revocation hearing was no more harmful to Whitehead than was the properly admitted evidence concerning Whitehead's threats to kill Hyde after Whitten's murder. Therefore, we find no error, plain or otherwise, as to this claim.

B.
Next, Whitehead contends that the trial court erred by permitting the State to introduce evidence that when he was arrested, he had in his possession a rifle and ammunition. Specifically, he cites the testimony of Dola Dyson, a deputy with the Marshall County Sheriff's Department, who aided in apprehending Whitehead and who testified that Whitehead was carrying a rifle and that he had at least 60 rounds of ammunition in the pockets of his jacket when he was arrested.
A careful review of the record reveals that evidence that Whitehead was carrying a rifle when he was arrested had already been presented to the jury before Dyson's testimony. Angelina Whitehead, Whitehead's sister-in-law, who was present when Whitehead was arrested, testified that she saw Whitehead with the rifle before he surrendered to the police. Whitehead failed to object to the testimony of either Dyson or Angelina regarding the rifle and ammunition; therefore, we will review this claim under the plain-error rule. Rule 45A, Ala.R.App.P. Although Whitehead's failure to object does not preclude our review of this issue, it does weigh against any claim of prejudice. See Knotts v. State, 686 So.2d 431 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997).
Whitehead again makes nothing more than a general claim that the evidence of his possession of a rifle and ammunition when he was arrested was irrelevant and prejudicial. We disagree. The circumstances surrounding Whitehead's arrest were both relevant and material to the State's case. Whitehead's surrender to police came only after he fled into the woods with a rifle and ammunition and then threatened to commit suicide when officers attempted to arrest him.
"`In a criminal prosecution the State may prove that the accused engaged in flight to avoid prosecution ... as tending to show the accused's consciousness of guilt.... The State is generally given wide latitude or freedom in proving things that occurred during the accused's flight.' C. Gamble, McElroy's *826 Alabama Evidence § 190.01(1) (3rd ed.1977). `Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime.' Tate v. State, 346 So.2d 515, 520 (Ala.Cr.App. 1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. See Tate, supra; Neal v. State, 372 So.2d 1331, 1344-45 (Ala.Cr.App. 1979). For the same reason, evidence that the accused resisted or attempted to avoid arrest is admissible. Crenshaw v. State, 225 Ala. 346, 348, 142 So. 669 (1932)."
Beaver v. State, 455 So.2d 253, 257 (Ala.Cr. App.1984). See also Travis, supra. The evidence that Whitehead was carrying a rifle and ammunition was admissible to show the circumstances surrounding his arrest, specifically, his attempt to flee and to avoid arrest by hiding in the woods.
"`"`All evasions or attempts to evade justice, by a person suspected or charged with a crime, are circumstances from which a consciousness of guilt may be inferred, if connected with other criminating facts. Of themselves they may not warrant a conviction, but they are relevant as evidence, and the weight to which they are entitled it is the province of the jury to determine.... Flight for which no proper motive can be assigned, and which remains unexplained, is a circumstance, all authorities agree, it is proper to submit to the jury, in connection with other evidence tending to show the guilt of the accused....'"'"
Travis, 776 So.2d at 858, quoting Childers v. State, 338 So.2d 1058 (Ala.Cr.App.1976), quoting, in turn, other cases. Thus, there was no error, plain or otherwise, in admitting this evidence concerning the circumstances of Whitehead's arrest.

C.
Whitehead also contends that the trial court erred in allowing testimony by Dola Dyson that Whitehead had been arrested for a parole violation. We must assume that Whitehead's claim in this regard, since he provides no supporting argument, is that Dyson's testimony put before the jury evidence that Whitehead was, at the time of Whitten's murder, on parole for a prior conviction. Whitehead presents this claim for the first time on appeal; therefore, we may review it only for plain error. See Rule 45A, Ala.R.App.P.
As the State correctly points out in its brief to this court, the jury was well aware, before Dyson's testimony, that Whitehead was on parole at the time of Whitten's murder. In fact, as we have already noted, the first mention at trial of Whitehead's parole was by the defense. During cross-examination of Detective Cole, Whitehead's counsel questioned Cole about Whitehead's parole revocation hearing, which was held as a result of the Hudson Foods investigation. One of Whitehead's defense strategies at trial was to negate the State's theory of motive by showing that at the parole revocation hearing, Whitehead confessed to clocking in and out of work without working and, thus, had confessed to being guilty of theft of property; therefore, under the defense's theory, Whitehead would have had no reason to murder Whitten to prevent his testimony in the event of a trial on the theft charges. Whitehead's counsel questioned several of the State's witnesses concerning Whitehead's alleged confession at the parole revocation hearing, thereby voluntarily placing before the jury evidence that Whitehead had been on parole for a prior conviction at the time of Whitten's murder.
"`"A defendant cannot by his own voluntary conduct invite error and then seek to profit thereby. Boutwell v. State, 279 Ala. 176, 183 So.2d 774 (1966); Aldridge v. State, 278 Ala. 470, 179 So.2d 51 (1965); Buford v. State, 214 Ala. 457, 108 So. 74 (1926); Barber v. State, 151 Ala. 56, 43 So. 808 (1907). `It would be a sad commentary upon the vitality of the judicial process if an accused could render it improper by his own choice.' Aldridge, *827 278 Ala. at 474, 179 So.2d at 54; Jackson v. State, 38 Ala.App. 114, 116, 78 So.2d 665, cert. denied, 262 Ala. 702, 78 So.2d 667 (1955). This is not a situation where a defendant merely remained silent and permitted error to occur. Turner v. State, 54 Ala.App. 467, 309 So.2d 503 (1975)."'"
Rieber v. State, 663 So.2d 985, 991 (Ala.Cr. App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), quoting Rowe v. State, 625 So.2d 1210, 1213 (Ala.Cr.App.1993).
Because evidence that Whitehead was on parole for a prior conviction was already properly before the jury, Dyson's testimony that Whitehead had been arrested for a parole violation was merely cumulative, and therefore harmless. "Testimony that may be inadmissible may be rendered harmless by prior or subsequent lawful testimony to the same effect or from which the same facts can be inferred." Travis, 776 So.2d at 861. For the reasons above, we find no error, much less plain error, as to this claim.

D.
In addition, Whitehead contends that the trial court erred in permitting the State to introduce evidence that he allegedly robbed a church in Albertville. Whitehead cites the testimony of Jason Windsor, who testified as to a conversation he had had with Whitehead regarding Whitten before Whitten's murder:
"[Prosecutor]: All right. Was there any time that you ran into Mr. Whitehead during that period of time that he made any statements to you concerning Andy Whitten?
"[Windsor]: Yes, sir.
"[Prosecutor]: Do you recall approximately when that was?
"[Windsor]: We had a conversation about the subject right after Thanksgiving, just before Christmas.
"[Prosecutor]: Would that have been in 1994?
"[Windsor]: Yes, sir.
". . . .
"[Prosecutor]: What was the conversation you had with him or he had with you?
"[Windsor]: I always talked to him about working at Hudson Foods. I'd always kid with him about getting a job and not working and getting paid for it. I'd always say, you know, how about getting me a job, you know, where I can get the money and be paid and not have to do anything. And he'd always joke back with me. When he'd been arrested and he was going to court on it, he'd always talk to me about a lawyer which was Shannon Mitchell. He always said that he was a good lawyer, that he was going to win his case, and he always made the comment that he believed he was going to win and sue for $4.5 million and that he'd be ablehe'd have a lot of money. He'd alwayshe always said to me that if he didn't win that he was going to kill every son-of-a-bitch in it, starting with the judge. And then he'd make comments and tell me, said, `If I do win, I'm going to come and get you and we're going to go out for a steak dinner.' I said, `Well, okay.' This went on for a period, I guess, a few weeks. And then one day I was working in the trailer park and I was picking up trash and you knowI'd go around and I'd pick up furniture, couches, and so forth. I pulled in. It was late in the evening. I believe it was on a Thursday. I had pulled in and he was outside and I got to talking with him about it and asked him if he thought he was going to win. He saidmade the comment again that he thought he was going to win and be able to sue for lots of money and that if he didn't, he'd be able tohe was going to shoot everybody in the courtroom, that he'd be in the paper. I said, `Well, you don't need to do that.' And he said, `Well, my lawyer had told me if a few people came up missing, that just couldn't show up for trial, that we would *828 be able to win the suit.' And I said, `What do you mean, come up missing? And he had made the comment to me that if [Whitten], or so forth, the others, would come up missing, he wouldn't have a case against him. I said, `What do you mean?' He said, `Well, in other words, my lawyer was telling me to murder him.' I said, `Okay.' I said, `I don't know if I'd do that, if I was you. You know, if you think you're going to win, why would you want to go do something like that, that'd be pretty silly.' At this time, we were having our conversation, Matt Hyde came walking outanother subject was with him, but I could not recall his name. As he came out and approached us, we was standing by my truck. And approximately six, seven foot away from the mobile home he started talking to us and he said, `Be quiet. Be quiet.' So we hushed up our conversation at that time. [Hyde] had walked by us, came by us, said, `Hey, how you doing?' and all this stuff, and then he went on.
"Then he started to me about a few years ago how he had some burglaries and that they had robbed a church in Albertville. I can't recall the name. And that he had took the rap for [Hyde] because [Hyde] was young and he didn't want tohe didn't want to
"[Whitehead's counsel]: Judge, I'm going to object to this litany.
"The Court: Sustained, yes.
"[Whitehead's counsel]: No question there. I'd ask the response be stricken.
"The Court: Well, you haven't objected in time to stop a narrative question. I'll overrule that. But let's go ahead and ask specific questions, [prosecutor].
"[Prosecutor]: As you were discussing when Matthew Hyde walked by, did Larry Whitehead say anything to you?
"[Whitehead's counsel]: May we approach? May we approach, Your Honor?
"The Court: Yes, sir.
"(The Court and counsel have the following side-bar discussion outside the hearing of the jury:)
"[Whitehead's counsel]: Judge, at this point in time I'm going to move for a mistrial based on the statement that the officer said that Mr. Whitehead said he had robbed and burglarized a church. This is offered in the form of a narrative. I'd ask that it be stricken. I don't want a curative instruction because obviously that would put it back before the jury. But this witness is a police officer. I think that statement was offered to inflame the jury. I'd like the record to reflect that in this particular county and in Dekalb County church burglaries within the last couple of monthsI don't know about this county because I represent a defendantthere have been church burglaries and stuff like that. At this point, I'd move based on the misconduct of the officer making that kind of statement.
"The Court: Let's make a little more record on that. The question was asked and the officer started into a narrative discussion of testimony which was not objected to. I would have sustained an objection and stopped that, but it wasn't asked for. At this point, I will overrule the objection, also overrule the motion for mistrial."
(R. 1352-56.)
At the outset, we note that Whitehead's objection to Windsor's narrative was not timely. See Bolden v. State, 568 So.2d 841, 848 (Ala.Cr.App.1989) ("`[T]o be timely, an objection must be made as soon as the ground for the objection becomes apparent.'"). Furthermore, Whitehead's objection was on the ground that Windsor's answer was in narrative form and not in response to a specific question asked; his objection was not on the ground that the prior robbery was inadmissible. Only later, *829 when making a motion for a mistrial, did Whitehead specifically state as grounds that testimony about the alleged church robbery was improper. Therefore, this issue was not properly preserved, and we may only review it for plain error. Rule 45A, Ala.R.App.P. We find that the testimony does not rise to the level of plain error.
The statement concerning the church robbery was elicited incidentally; it was a nonresponsive answer to a proper question pertaining directly to the case at hand. It was a single, isolated comment that was not timely objected to, which was unresponsive to the question posed by the prosecutor, and which the prosecutor did not exploit. See Parker v. State, 587 So.2d 1072 (Ala.Cr.App.1991). Furthermore, Whitehead expressly requested that no curative instruction be given. Normally, "`"an indirect reference to the defendant's involvement in other crimes is not incurably harmful to the accused, and any possible prejudice may be eradicated by the trial judge's prompt curative instruction to the jury."'" Dill v. State, 600 So.2d 343, 352 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992). However, where, as here, the defendant specifically requests that no curative instruction be given, or expressly refuses the offer of a curative instruction, any error is clearly invited.
After reviewing the record as a whole, and looking at this comment in the context of the entire case, "we do not believe that the statement was so egregious that it `seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings.'" Dill, 600 So.2d at 352, quoting Hooks v. State, 534 So.2d 329, 351-52 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Therefore, there was no plain error here.

XI.
Whitehead further contends that the prosecutor engaged in acts of misconduct at the guilt phase of his trial. (Issue XII in Whitehead's brief to this court.) Initially we note that Whitehead did not object to any of the instances of alleged misconduct by the prosecutor about which he complains on appeal. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). Thus, we must consider whether the prosecutor's comments and conduct constituted plain error. Rule 45A, Ala.R.App.P.
This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d *830 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the trial court unless there has been an abuse of that discretion. Id.

A.
Whitehead contends that the during his closing argument at the guilt phase, the prosecutor improperly expressed his personal opinions about the evidence. To support his claim, Whitehead refers this court to several remarks that the prosecutor prefaced with the phrases "I do not believe," "I think," or "We think." (R. 1658-59.)
As we stated in Drinkard v. State, 777 So.2d 225 (Ala.Cr.App.1998), in rejecting a claim similar to Whitehead's:
"`"While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence. See Woods v. State, 19 Ala. App. 299, 97 So. 179 (1923); Mitchell v. State, 50 Ala.App. 121, 277 So.2d 395, cert. denied, 291 Ala. 794, 277 So.2d 404 (1973); Mainor v. State, 339 So.2d 147 (Ala.Crim.App. 1976)."

"`Sams v. State, 506 So.2d 1027, 1029 (Ala.Cr.App.1986).'"
"Wilson v. State, 652 So.2d 778, 781 (Ala.Cr.App.1994).
"We have examined the instances the appellant cites, as well as the context of the comments in the entire closing argument, and we find no plain error. The prosecutor was not expressing his personal opinion as to the appellant's guilt; he was merely giving his impression of the evidence. The fact that the prosecutor prefaced some of his comments with `I know' or `I think,' or a similar expression, does not render the comments improper.
"`In Ex parte Rieber, 663 So.2d 999 (Ala.1995), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), the Alabama Supreme Court stated:
"`"Furthermore, we view those comments that the prosecutor prefaced with `I think,' `I believe,' `I feel,' `I am satisfied,' and `I have no doubt,' as expressing his reasonable impressions from the evidence.... We note, however, that even if these comments were to be viewed as expressions of the prosecutor's personal opinions and, thus, as `crossing the line' as permissible argument, they, nonetheless, would not constitute reversible error."
"`See also, Boyd v. State, [715 So.2d 825 (Ala.Cr.App.1997)].'
"Roberts v. State, 735 So.2d 1244 (Ala. Cr.App.1997). See also Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998)."
777 So.2d at 272-73.
We have reviewed the prosecutor's comments in the context of the entire argument and find that, contrary to Whitehead's assertion, the prosecutor was legitimately commenting on the evidence and was drawing reasonable inferences and conclusions from that evidence. The remarks the prosecutor prefaced with such phrases as "I do not believe," "I think," or "We think" were not impermissible argument, and they did not constitute reversible error. Accordingly, we find no plain error as to this claim.

B.
Whitehead also contends that the prosecutor improperly elicited testimony at trial concerning the circumstances surrounding Whitehead's arrest. Specifically, Whitehead argues that any testimony concerning his arrest was "devastatingly prejudicial" and was "irrelevant to the issues at trial." (Whitehead's brief to this court, *831 p. 60.) Whitehead did not present this claim to the trial court; therefore, it is subject to review only for plain error. Rule 45A, Ala.R.App.P.
The record reveals that at approximately 8:00 p.m. on January 26, 1995, two days after Whitten was shot, after learning that he was a suspect in the murder and that the police were looking for him, Whitehead went to his brother's house where, according to Whitehead's sister-in-law, Whitehead, his sister-in-law, and his brother saw a sheriff's car drive by the property. Whitehead's sister-in-law testified that after the sheriffs car had driven away, Whitehead left the house, carrying a rifle, and went into a wooded area surrounding the house. She further testified that Whitehead was gone for several hours before returning to the house to get something to eat. According to Whitehead's sister-in-law, Whitehead stayed at the house for approximately 15 minutes and then left, returning to the woods. Whitehead's sister-in-law also testified that at approximately 3:30 a.m. on the morning of January 27, several police cars arrived at the house, and armed officers entered the house looking for Whitehead. After she told the police that Whitehead was in the woods, the police began searching for Whitehead. Whitehead eventually came out of the woods, with his rifle pointed at the ground, and surrendered to the police. At some point before surrendering, Whitehead put the barrel of the rifle into his mouth and threatened to kill himself. Whitehead was eventually arrested and taken into custody.
Contrary to Whitehead's assertion, the circumstances surrounding his arrest were relevant and admissible as evidence that tended to show Whitehead's consciousness of guilt. "`In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution. This principle is based upon the theory that such is admissible as tending to show the accused's consciousness of guilt. The flight of the accused is admissible whether it occurred before or after his arrest.'" Hart v. State, 612 So.2d 520, 530 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala. 1992), cert. denied 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), quoting C. Gamble, McElroy's Alabama Evidence § 190.01 (4th ed.1991) and cases therein. "`"`The state is generally given wide latitude or freedom in proving things that occurred during the accused's flight. This is especially true of those acts of the accused which tend to show that the flight was impelled by his consciousness of guilt.'"'" Boyd v. State, 715 So.2d 825, 845 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998), quoting Long v. State, 668 So.2d 56, 60-61 (Ala.Cr.App. 1995) (quoting, in turn, Sartin v. State, 615 So.2d 135, 137 (Ala.Cr.App.1992)). Evidence that the accused resisted or attempted to avoid arrest is admissible as tending to show the accused's consciousness of guilt. See Rogers v. State, 630 So.2d 88 (Ala.1992). Moreover:
"`[A]ny indications of a consciousness of guilt, however minute or insignificant they may be, are admissible against a defendant if they tend to elucidate the transaction. McAdory v. State, 62 Ala. 154 (1878). Generally, it is permissible to show the whereabouts of the defendant both prior and subsequent to the commission of the offense to the time of his arrest. Clifton v. State, 359 So.2d 853 (Ala.Cr.App.1978).'"
State v. Mason, 675 So.2d 1, 4 (Ala.Cr.App. 1993), quoting Magro v. State, 384 So.2d 871, 875 (Ala.Cr.App.), cert. denied, 384 So.2d 875 (1980).
Based on the above, we find that the prosecutor properly elicited relevant testimony concerning Whitehead's conduct before his arrest that indicated his consciousness of guilt of the crime he was suspected of committing.

C.
Lastly, Whitehead contends that the cumulative effect of the prosecutor's alleged *832 misconduct warrants a reversal of his conviction. Because we find that no single instance of the prosecutor's conduct was improper, any claim that the alleged improper conduct had a cumulative prejudicial effect on his trial is without merit. See Melson v. State, 775 So.2d 857 (Ala.Cr. App.1999); Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); and Hunt v. State, 642 So.2d 999 (Ala.Cr.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).

XII.
Whitehead contends that the trial court erred in failing to give certain jury instructions in its oral charge and that several of the trial court's instructions to the jury were improper. (Issue IX in Whitehead's brief to this court.) Initially, we note that Whitehead did not object in the trial court to any of the matters about which he now complains; therefore, we will review his claims pursuant to the plain-error rule. Rule 45A, Ala.R.App.P.

A.
Whitehead contends that the trial court erred in failing to instruct the jury on voluntary intoxication and on manslaughter as a lesser included offense of capital murder. Whitehead did not request either instruction at trial. Nor did he object upon conclusion of the trial court's oral charge when the court did not include these instructions in its charge. Thus, we will review his claim only for plain error. Rule 45A, Ala.R.Crim.P.
In Smith v. State, 756 So.2d 892, 904 (Ala.Cr.App.1998), we stated:
"`"A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Cr.App.1990), cert. denied, 581 So.2d 1216 (Ala.1991). A court may properly refuse to charge on a lesser included offense ... when... it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense ... Anderson v. State, 507 So.2d 580 (Ala.Cr.App.1987).... Section 13A-1-9(b) provides, `The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.'"'
"[Boyd v. State,] 699 So.2d [967] at 972 [(Ala.Cr.App.1997)].
"`Intoxication, whether voluntary or involuntary, is admissible in evidence whenever it is relevant to negate an element of the offense charged.' § 13A-3-2(a), Ala.Code 1975. In McConnico v. State, 551 So.2d 424 (Ala.Cr.App.1988), we held:
"`While voluntary intoxication is never a defense to a criminal charge, it may negate the specific intent essential to a malicious killing and reduce it to manslaughter. § 13A-3-2, Code of Alabama (1975) (Commentary). "`When the crime charged involves a specific intent, such as murder, and there is evidence of intoxication, the trial judge should instruct the jury on the lesser included offense of manslaughter.' Gray v. State, 482 So.2d 1318, 1319 (Ala. Cr.App.1985)." McNeill v. State, 496 So.2d 108, 109 (Ala.Cr.App.1986).'
"551 So.2d at 426. However, to negate the specific intent required for a murder conviction, the degree of the accused's intoxication must amount to insanity."
756 So.2d at 906. "[E]vidence of ingestion of alcohol or drugs, standing alone, is insufficient to support a charge on intoxication." Maples v. State, 758 So.2d 1 (Ala. Cr.App.1999). There must also be "evidence that the ingestion caused a disturbance of the person's mental or physical *833 capacities and that that mental or physical disturbance existed at the time the offense was committed." Maples, 758 So.2d at 23. As this court stated in Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997),
"In this case, however, there was no evidence that the appellant was intoxicated. Although there was evidence that the appellant had been drinking beer on the day of the robbery-murder, there was no evidence concerning the quantity of beer he consumed that day at the time of the murder. Evidence that someone was drinking an alcoholic beverage is not evidence that that person was intoxicated. There was no `reasonable theory' to support an instruction on intoxication because there was no evidence of intoxication. The court did not err in not instructing the jury on intoxication and manslaughter where there was no evidence that the appellant was intoxicated at the time the robbery-murder occurred."
683 So.2d at 1037.
Contrary to Whitehead's contention on appeal, the evidence did not establish that he or his codefendants, Hyde and Brookshire, were intoxicated at the time of Whitten's murder. Although there was some evidence, primarily from Whitehead in his testimony at Hyde's trial, that Whitehead, Hyde, and Brookshire used drugs on a regular basis and that they had used drugs on the day of the murder, there was no evidence that Whitehead or his codefendants were intoxicated at the time of the murder. There was also no evidence as to when, specifically, they had taken any drugs or how much they had taken. In fact, during his testimony at Hyde's trial, Whitehead stated that he was not so "wired up" on the night of the murder that he did not remember what happened. (R. 1614.) Whitehead also stated at Hyde's trial that he "remembered perfectly" what happened the night Whitten was shot and killed. (R. 1614.) Further, Brookshire testified that he, Whitehead, and Hyde were not "wired or zonked" on the night of the murder. (R. 1463.) There is absolutely no evidence to support Whitehead's claim on appeal that he was "extremely intoxicated before, during, and after the crime." (Whitehead's brief to this court, p. 38.) Nor is there any evidence to support Whitehead's claim that Whitten's murder was the "result of drugs," as opposed to being the result of Whitten's involvement as a witness in the pending theft charge against Whitehead. (Whitehead's brief to this court, p. 39.) Whitehead argues in his brief to this court that he was entitled to an instruction on voluntary intoxication and manslaughter because, he claims, he and his accomplices were "heavily involved with drugs" and "took methamphetamines on a daily basis" in the months preceding the crime. (Whitehead's brief to this court, pp. 38-39.) Even assuming this assertion to be true, Whitehead is misguided in arguing that this amounts to evidence of intoxication that would entitle him to an instruction on voluntary intoxication and manslaughter. Evidence that someone was a habitual drug user is not evidence that that person was intoxicated at the time of the murder. See Windsor, supra.
Because there was no evidence of intoxication, there was "no reasonable theory" to support an instruction on voluntary intoxication and manslaughter. See Hyde, supra (where we decided this same claim adversely to Whitehead's codefendant Hyde on essentially the same evidence of alleged intoxication).
Moreover, as the State correctly points out in its brief to this court, the evidence at trial established that Whitten's murder had been planned in advance. Angelina Whitehead, Whitehead's sister-in-law, testified that several days before the murder, Whitehead attempted to get her husband to go with him to Whitten's house. Also, there was testimony that shortly before Whitten's murder, Whitehead was seen *834 riding around in Whitten's neighborhood looking for Whitten's house. Whitehead even knocked on one of Whitten's neighbors's door asking the neighbor which house was Whitten's. Before Whitten's murder, Whitehead had told numerous persons that if Whitten was out of the way, he could win a civil lawsuit against Hudson Foods. Further, on the morning of the murder, Whitehead asked Brookshire if he would "drive for him" later that night because he had to "get rid of his witness." It seems unlikely, and certainly unreasonable, that Whitehead was incapable of forming the intent to murder Whitten because he was intoxicated. There was no plain error here.

B.
Whitehead also contends that in charging the jury on the capital offense of murder during a burglary, the trial court "never told the jury how to determine if there had been an `entry' [into Whitten's house]." (Whitehead's brief to this court, p. 42.) Therefore, Whitehead says, the jury could not properly determine whether he was guilty of that capital offense.
The trial court's instructions were materially identical to those set out in the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Stage of Capital Cases Tried Under Act No. 81-178. "A trial court's following of an accepted pattern jury instruction weighs heavily against any finding of plain error." Price v. State, 725 So.2d 1003, 1058 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). We have reviewed the trial court's jury instructions on the capital offense of murder committed during a burglary, and we hold that the trial court correctly charged the jury on all elements of the offense. (R. 1762-65.) See also Hyde, supra (where we decided this identical claim adversely to Whitehead's codefendant Hyde). Thus, there was no plain error as to this matter.

C.
Whitehead further contends that the trial court's instructions on reasonable doubt were improper because, he says, there was a "reasonable likelihood that the jury understood the court's instructions to permit a conviction based on insufficient proof." (Whitehead's brief to this court, p. 44.) Other than citing Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), and claiming only generally that the trial court's instructions on reasonable doubt were in violation of Cage, Whitehead does not specifically argue how the reasonable-doubt instructions in his case were erroneous.
The trial court charged the jury, in pertinent part, as follows:
"The phrase `reasonable doubt' that I have used is somewhat self-explanatory. Efforts to define it do not always clarify the term; however, it may be helpful to you to know that a reasonable doubt is not a mere guess or surmise. It is a doubt based upon reason and logic and not upon speculation. If, after considering all the evidence in the case, you have an abiding conviction of the truth of the charge, then you are convinced beyond a reasonable doubt and it would be your duty to convict the defendant. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural or speculative doubt, but a reasonable doubt arising from the evidence or from a part of the evidence or from a lack of the evidence and it remains after careful consideration of the testimony such as reasonable, fair-minded and conscientious people would entertain under all the circumstances. Now, the State is not required to convince you of the defendant's guilt beyond all doubt nor to a mathematical certainty nor beyond a shadow of a doubt, but if, after comparing and considering all the evidence in this case, your minds are left in such a condition that you cannot say that you have an abiding conviction of the defendant's guilt, then you are not *835 convinced beyond reasonable doubt and the defendant would be entitled to an acquittal."
(R. 1755-56.)
In Knotts v. State, 686 So.2d 431 (Ala. Cr.App.), opinion after remand, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), we stated, relevant to this claim:
"The Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined `reasonable doubt' by using the phrases `grave uncertainty,' `actual substantial doubt,' and `moral certainty' could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court `made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.' Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482. and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, 513 U.S. 1023, 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala. Cr.App.1994).
"In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of `reasonable doubt' in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)."
686 So.2d at 459.
We note that in our opinion affirming the capital murder convictions and the death sentence in the case of Whitehead's codefendant Hyde, we reviewed a reasonable-doubt instruction virtually identical to the reasonable-doubt instruction in this case, and found that the instruction was not improper, not confusing, and did not lessen the State's burden of proof. See Hyde, supra, 778 So.2d at 222. In reviewing the trial court's reasonable-doubt instruction in this case, in the context of the charge as a whole, we again do not find that the instruction violated the principles set forth in Cage. The trial court did not use any of the objectionable terms condemned by the United States Supreme Court in Cage. The charge given the jury in this case correctly conveyed the concept of reasonable doubt. Thus, we find no error, plain or otherwise, as to this claim.

D.
Whitehead contends that the trial court, in its oral charge to the jury, improperly characterized Whitehead's decision not to testify at trial as a "failure." (Whitehead's brief to this court, p. 44.) Specifically, Whitehead argues that by characterizing his decision not to take the stand as a "failure," the trial court "condemned" him for that decision, and "instructed the jury to do likewise." (Whitehead's *836 brief to this court, p. 45.) We do not agree.
The trial court instructed the jury, in pertinent part, as follows:
"Ladies and gentlemen, the defendant has not testified in this case, as is his perfect right. You are instructed that that is a fact from which you can draw no inference. It is not to be considered by you as a fact in the defendant's favor nor is it to be laid to the defendant's detriment. You may not draw any conclusion of any sort from the defendant's failure to testify."
(R. 1751-52.) The trial court's instructions were proper and did not, contrary to Whitehead's assertion on appeal, condemn Whitehead before the jury for not testifying. Instead, the instructions clearly informed the jury that it should draw no inference, either for or against Whitehead, as a result of Whitehead's exercising his right not to testify. Thus, we find no error, plain or otherwise, as to this claim.

E.
Lastly, Whitehead contends that the trial court failed to instruct the jury that it was required to vote for life imprisonment without the possibility of parole if it found that the aggravating circumstances and the mitigating circumstances were equal. As a result, says Whitehead, the trial court's instructions "inaccurately stated Alabama law and improperly created a presumption of death." (Whitehead's brief to this court, p. 46.)
In Ex parte Trawick, 698 So.2d 162 (Ala.1997), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), the Alabama Supreme Court, in rejecting a claim identical to the one raised by Whitehead, stated:
"Trawick next argues that during the penalty phase of the trial the court failed to instruct the jurors as to how they were to weigh the aggravating and mitigating circumstances of Trawick's case. The trial court instructed the jury that, if it found that the mitigating circumstances outweighed the aggravating circumstances, it was required to recommend a sentence of life imprisonment without parole. However, Trawick points out that the trial court did not further instruct the jury that if the aggravating and mitigating circumstances were equally balanced, the jury was likewise required to recommend a sentence of life imprisonment. Trawick concludes that, because Alabama law requires that aggravating circumstances must outweigh mitigating circumstances in order for a jury to recommend the death sentence, the trial court's instructions misstated Alabama law and improperly created an inference that the jury was required to recommend the death penalty if it found that the circumstances were equally balanced.
"Because Trawick did not raise this issue at trial, we must consider it in accordance with the plain error rule. We note that the jury instructions as to the weighing of aggravating circumstances and mitigating circumstances were materially the same as those set out in the Alabama Pattern Jury Instructions: Criminal for use in the sentencing stage of a capital murder trial in this state, and this Court has held that no reversible error will be found when the trial court follows the pattern jury instructions adopted by this Court. Kuenzel v. State, supra. The trial court correctly instructed the jury to recommend the death penalty only if it found that the aggravating circumstances outweighed the mitigating circumstances, obviously implying that in all other circumstances the jury was required to recommend a sentence of life imprisonment without parole. We do not agree with Trawick that this instruction could have misguided the jury as to its responsibility and function in weighing the aggravating and mitigating circumstances; on the contrary, the instruction clearly explained that the jury could recommend the death penalty under only one *837 circumstance. Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). We therefore find no plain error in the instruction as given."
698 So.2d at 173-74. See also Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.1999).
The trial court properly instructed the jury in this case that it could recommend the death penalty only if the aggravating circumstances outweighed the mitigating circumstances; therefore, "it was clear that if the aggravating and mitigating circumstances were equally balanced or if the mitigating circumstances outweighed the aggravating circumstances, then the jury was required to vote for life imprisonment without parole." Stewart, 730 So.2d at 1230. Accordingly, we find no plain error as to this issue.

XIII.
Whitehead contends that the facts of his case precluded a conviction for the capital offense of murder committed during a burglary. See § 13A-5-40(a)(4), Ala.Code 1975. (Issue III in Whitehead's brief to this court.) First, he argues that the State failed to prove an "entry" into Whitten's dwelling, as required to prove the offense of burglary. See § 13A-7-5, Ala.Code 1975. Second, he argues that "the Double Jeopardy Clause prohibits a conviction of both burglary and murder for precisely the same act." (Whitehead's brief to this court, p. 18.) Third, he argues that the use of the same act to elevate a crime from murder to capital murder is a violation of the Eighth Amendment to the United States Constitution. Because none of these claims was presented to the trial court, we review them under the plain-error rule. Rule 45A, Ala.R.App.P. We address each argument in turn.

A.
Whitehead contends that the State failed to prove an "entry." Specifically, he contends that "shooting a bullet through the partially open door does not constitute entry" and that "[n]either the Alabama Code nor Alabama caselaw provide[s] that the flight of a bullet from outside a dwelling can constitute entry for purposes of proving a burglary." (Whitehead's brief to this court, p. 17.)
We have addressed this identical claim on previous occasions and, each time, have decided it adversely to those advancing it. See Hyde v. State, 778 So.2d 199 (Ala.Cr. App.1998); and Pack v. State, 461 So.2d 910 (Ala.Cr.App.1984). In Pack, we stated:
"`A ... distinction, however, has been made between the entrance of some part of the body and the introduction of a tool or other instrument, with reference to the purpose with which it was put into the building. Where it is a part of the body itself, its insertion into the building is an entry within the rules of burglary, whether the purpose was to complete the felonious design or merely to effect a breaking. Thus if the miscreant should open a window too small to admit his body, and should insert his hand through this opening merely for the purpose of unlocking a door, through which he intends to gain entrance to the building, he has already made an "entry" even if he should get no farther. But where a tool or instrument is intruded, without any part of the person being within the house, it is an entry if the insertion was for the purpose of completing the felony, but not if it was merely to accomplish a breaking. If the instrument is inserted in such a manner that it is calculated not only to make a breach but also to accomplish the completion of the felonious design[,] this constitutes both a breach and an entry. Hence, if a shot is fired merely to break a lock, there would be no entry even if the bullet landed inside the building, *838 whereas if the weapon had been discharged for the purpose of killing an inmate of the house the entrance of the ball into the dwelling would be sufficient for an entry as the word is used within the rules of burglary.'"
461 So.2d at 916, quoting R. Perkins, Perkins on Criminal Law (2d ed.1969) (emphasis added).
Here, the evidence showed that James Matthew Hyde, Whitehead's codefendant, entered an enclosed back porch of Whitten's house and knocked on the inner door of the porch that opened into Whitten's house. When Whitten partially opened the door, Hyde shot him through the door; the bullet entered Whitten's stomach, and ultimately killed him. The entrance of the bullet into Whitten's house constituted an "entry" within the meaning of the burglary statute. We came to this same conclusion in Hyde, wherein Hyde made an identical argument on appeal. In Hyde, we explained:
"In Westbrook v. State, 687 So.2d 216 (Ala.Cr.App.1996), we discussed those situations in which the entry of an object into a building may satisfy the entry element of the burglary statute:
"`"`Prior to the effective date of the Alabama Criminal Code (Code of Alabama 1975, Title 13A) both a breaking and an entry were essential elements of the crime of burglary, but a breaking has been eliminated as an essential element by § § 13A-7-5, 13A-7-6, and 13A-7-7. To constitute an entry, there must be a penetration of the space within the building by some part of the body of the defendant, or by an instrument inserted for the purpose of perpetrating a felony in the building. In Walker v. State, 63 Ala. 49, 51 (1879), it was held:
"`"`"When one instrument is employed to break and is without capacity to aid otherwise than by opening a way of entry, and another instrument must be used, or the instrument used in the breaking must be used in ... some other way or manner to consummate the criminal intent, the intrusion of the instrument is not, of itself, an entry.
"`"`"When entry is made by means of an instrument, it must be used for the purpose of effecting the felony, and not merely gaining entrance for the defendant. Accordingly, the act of prying open a door with an iron bar does not constitute an entry, as it is not used for the purpose of committing a felony therein, but merely of breaking."
"`"To the same effect is Robinson v. State, 45 Ala.App. 74, 78, 224 So.2d 675 (1969), where it is stated:
"`"`"The evidence that the door `was pried open and the lock was busted with some type of instrument' did not show an entry into the building."'
"`"Perry v. State, 407 So.2d 183, 185 (Ala.Cr.App.1981). See Pack, [supra]; see also People v. Tragni, 113 Misc.2d 852, 449 N.Y.S.2d 923 (1982)."'
"687 So.2d at 217. Clearly, [Hyde] fired the bullet into the house with the intent to commit a felony, namely murder, therein. Therefore, the entry of the bullet into the house constituted an entry under the burglary statute.
"Thus, both [Hyde's] entry into the enclosed porch area and his causing the bullet to enter Whitten's house constitute entries under the burglary statute. The evidence also showed that the appellant's entry was unlawful because he did not have permission to enter the house. In addition, [Hyde] was armed with a gun, which is a deadly weapon, and he entered the house with the intent to commit murder. Therefore, the evidence was sufficient to support [Hyde's] burglary/murder conviction."
Hyde, 778 So.2d at 212-13.
For the same reasons we stated in Hyde, we find that the State presented *839 sufficient evidence to sustain Whitehead's conviction for capital murder during a burglary.

B.
Whitehead also contends that his convictions for both burglary and capital murder based on the same act violated his right to be free from double jeopardy. We hasten to point out, however, that Whitehead was not convicted of burglary; he was convicted of murder made capital because it occurred during the course of a burglary. Capital murder is but one offense; therefore, double jeopardy is inapplicable, and this argument is meritless. See Hyde, supra (finding this identical issue to be meritless).

C.
Finally, Whitehead contends that "the use of the murder itself to elevate the murder to capital murder violates the requirement that capital murder statutes `genuinely narrow' the class of persons eligible for the death penalty." (Whitehead's brief to this court, p. 20.) This same argument was raised on appeal by Whitehead's codefendant Hyde and was rejected by this court. See Hyde, supra. Likewise, we reject Whitehead's argument. Whitten's murder was elevated to capital murder because it was committed during the course of a burglary and because the victim was a witness, not because of the murder itself. See § 13A-5-40(a)(4), Ala. Code 1975. Because the State sufficiently proved the elements of burglary, Whitehead was properly convicted of the capital offense of murder during a burglary.

XIV.
Whitehead contends that the trial court committed reversible error because, he says, it failed to instruct the jury on an essential element of the capital offense of the murder of a witness. See § 13A-5-40(a)(14), Ala.Code 1975. (Issue II in Whitehead's brief to this court.) Specifically, he claims that the trial court failed to instruct the jury that, in order to convict Whitehead of that capital offense, it must find that Whitehead knew at the time of Whitten's murder that Whitten was a witness. (Whitehead's brief to this court, p. 8.) Whitehead did not object at trial to the court's failure to give such an instruction; therefore, we will review his claim under the plain-error rule. Rule 45A, Ala.R.App.P. Whitehead's failure to object weighs heavily against a finding of prejudice in our review for plain error. See Knotts v. State, 686 So.2d 431 (Ala.Cr. App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997).
The trial court instructed the jury, in pertinent part, as follows:
"The defendant is charged with the offenses known as murder of a witness, of a grand jury witness, murder of a subpoenaed witness that is going to testify in a criminal case, and murder during burglary in the first degree.
"The charge of murder of a witness who testified before the grand jury reads as follows: Larry Wayne Whitehead did intentionally cause the death of Ernest Andrew Whitten by shooting him with a pistol when Ernest Andrew Whitten had testified in a grand jury proceeding in the case State of Alabama v. Larry Wayne Whitehead, a charge of theft of property first degree, and said murder stemmed from, was caused by or was related to the capacity or role of Ernest Andrew Whitten as said witness. Now, that is the charge of murder of a witness and it will be designated on your verdict form as murder of a grand jury witness.
"The second charge with which the defendant is charged is Larry Wayne Whitehead did intentionally cause the death of Ernest Andrew Whitten by shooting him with a pistol when Ernest Andrew Whitten was subpoenaed or had been subpoenaed to testify in a criminal trial or proceeding in the case State of Alabama v. Larry Wayne Whitehead in *840 the Circuit Court of Marshall County, Alabama, case number so and so [sic], on a charge of theft of property first degree, and that said murder stemmed from, was caused by, or was related to the capacity or role of Ernest Andrew Whitten as said witness. That charge is also murder of a witness but it will be designated as murder of a witness subpoenaed to testify in a criminal case.
". . . .
"The law states that the intentional murder of a witness is capital murder. A person commits an intentional murder of a witness if he causes the death of another person and in performing the act or acts which caused the death of that person he intends to kill that person when the person has testified before a grand jury proceeding in any municipal, state, or federal court and the murder stems from, is caused by, or is related to the capacity or role of that person as a witness. To convict the State must prove beyond a reasonable doubt each of the following elements of intentional murder of a witness: number one, that Andrew Whitten is dead; number two, that the defendant Larry Wayne Whitehead caused the death of Andrew Whitten by shooting him with a pistol; number three, that in committing the act which caused the death of Andrew Whitten, the defendant intended to kill the deceased. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific. You may and you are authorized if you find that the defendant used a deadly weapon or dangerous instrument, that it was the intent to cause death. You are not required to do so, but you may do so. Number four, that Andrew Whitten had testified in a grand jury proceeding.
"Now, a person commits the intentional murder of a witness if he causes the death of another person and in performing that act, he intends to kill that person when that person is subpoenaed or has been subpoenaed to testify or will testify in a criminal trial of whatever nature in any municipal, state or federal court. And the murder stems from, is caused by, or is related to the capacity or role of that person as a witness. The elements of that offense are the same as that of a grand jury witness except that Andrew Whitten must be proven to you beyond a reasonable doubt that he was subpoenaed to testify in a criminal proceeding."
(R. 1757-62.) (Emphasis added.)
Whitehead claims that the above-quoted instructions were deficient because, he argues, the trial court did not follow the Alabama Proposed Pattern Jury Instructions for Use in the Guilt Phase of Capital Cases (3d ed.1994); those pattern jury instructions would have had the court instruct the jury that in order to convict Whitehead of the capital offense of the murder of a witness it must find that Whitehead "knew the deceased was a witness at the time [of the murder]." (Whitehead's brief to this court, pp. 8-9, citing the Alabama Proposed Pattern Jury Instructions.) While we acknowledge that this court has repeatedly held that a trial court's following of the proposed pattern jury instructions weighs heavily against a finding of error, we do not agree with Whitehead that the failure to follow the proposed pattern jury instructions is automatically cause for reversal. The State argues, and we agree, that the trial court's instructions in this case properly and adequately conveyed to the jury all of the required elements of the capital offense of the murder of a witness.
"A trial court has broad discretion in formulating its jury instructions, provided those instructions accurately reflect the law and the facts of the case. A trial court's oral charge to the jury must be construed as a whole, and must be given a reasonablenot a strainedconstruction." Pressley v. State, 770 So.2d 115, 139 (Ala.Cr.App.1999) (citations omitted). An inadvertent error that does not *841 cause prejudice to the defendant is not reversible error. See Gunter v. State, 665 So.2d 1008 (Ala.Cr.App.1995).
Here, the trial court's instructions adequately conveyed the law to the jury. The trial court repeatedly instructed the jury that it must find that Whitten's murder "stem[med] from, [was] caused by, or [was] related to" Whitten's "capacity or role" as a witness. Implicit in any such finding by the jury is the jury's conclusion that Whitehead knew that Whitten was a witness. The jury could not reasonably have found that Whitten's murder stemmed from, was caused by, or was related to his capacity or role as a witness unless it found that Whitehead knew that Whitten was a witness. The trial court's instructions sufficiently informed the jury that it had to find that Whitten was murdered because he was a witness and could not have misled the jury into believing that, in order to convict, it needed only to find that Whitten was murdered and that, incidentally, Whitten happened to be a witness.
In arguing that he was prejudiced as a result of the trial court's instructions, Whitehead claims on appeal that the evidence regarding whether he knew that Whitten was a witness was conflicting and in dispute; therefore, he says, the trial court's instructions improperly relieved the state of its full burden of proof and allowed the jury to convict him without finding that he knew that Whitten was a witness. We do not agree. Nothing Whitehead points to in his appellate brief provides any basis for the claim that the evidence was conflicting as to whether he knew that Whitten was a witness.
For example, Whitehead cites a portion of his trial counsel's closing argument at the guilt phase, in which trial counsel argued that it was incredible to believe that Whitehead reasonably thought that if the theft charges against him were dismissed, he could win a multimillion-dollar civil lawsuit against Hudson Foods on the ground that he had been falsely accused and arrested for theft. The State correctly points out in its brief to this court that, first, the argument of counsel is not evidence, and second, whether Whitehead's belief that he could win the lawsuit was reasonable was irrelevant. The relevant question was instead whether the evidence showed that he actually entertained the belief, regardless of its reasonableness, and thus was motivated to kill Whitten for that reason. Numerous witnesses testified that Whitehead stated that he thought that he could win the lawsuit against Hudson Foods if Whitten was "out of the way." Further, and quite apart from the lawsuit, Whitehead had another motive for killing Whittento prevent Whitten from testifying against him at his trial on the theft charges. If Whitehead was convicted of first-degree theft, he would be sentenced as a habitual felony offender to life imprisonment. Whitehead's testimony at Hyde's trial showed that Whitehead was aware of the prison sentence he would be facing if convicted of theft. Several witnesses testified that Whitehead said he would "kill everybody" before he went back to prison. In fact, Whitehead admitted during his testimony at Hyde's trial that he would "shoot up the courtroom" and kill "anybody that had my life, tried to stop me." (R. 1601.)
Whitehead further argues that his confession to the Hudson Foods theft, which he allegedly made at his parole revocation hearing concerning the theft investigation, represented a conflict in evidence concerning his knowledge of Whitten's status as a witness because, he says, the fact that he confessed demonstrates that the "probability of a successful civil suit against Hudson Foods was approximately nil and Mr. Whitehead's motive to kill Andy Whitten vanished." (Whitehead's brief to this court, p. 11.) Again, whether there would have ever been a lawsuit against Hudson Foods, or whether if there was one, it would have been unsuccessful, is irrelevant. Even assuming that it was unlikely that there would ever be a successful *842 civil lawsuit, we do not consider this to be evidence indicating that Whitehead was unaware of Whitten's status as a witness. As we stated previously, numerous witnesses testified that Whitehead told them that if Whitten was "out of the way," he could win a multimillion-dollar lawsuit against Hudson Foods. Also, as we previously stated, the lawsuit was not the only evidence of motive advanced by the State. Other evidence of a motive to kill Whitten existed with respect to the possible life sentence Whitehead was facing if he was convicted of theft.
Also, Whitehead refers this court to the testimony of his codefendant Stephen Brookshire as proof that evidence of his knowledge of Whitten's status as a witness was conflicting. Specifically, he points to the portion of Brookshire's testimony where Brookshire stated that he had never heard Whitehead talk about a lawsuit against Hudson Foods until after the murder. Whitehead claims that this testimony supports his theory that there was a conflict as to whether he knew that Whitten was a witness. As the State correctly points out in its brief to this court, Brookshire's testimony supported the opposite conclusion. Brookshire testified that on the morning of the murder, Whitehead asked him to "drive for him" later that night, specifically telling Brookshire that he (Whitehead) "had to get rid of his witness." (R. 1403.)
Whitehead also directs this court's attention to what he refers to as his "defense theory that the killing was related to [his] drug use." (Whitehead's brief to this court, p. 12.) Contrary to his claims on appeal, there is absolutely no evidence that Whitten's murder was drug-related. Any testimony concerning Whitehead's and his codefendants' drug use was immaterial to Whitehead's knowledge of Whitten's status as a witness. Whitehead knew that Whitten was investigating the Hudson Foods theft case. He was interviewed by Whitten concerning the theft allegations, and he was aware that he had been indicted for theft and that his trial was scheduled to begin six days after Whitten's murder.
We conclude, in view of the particular facts and circumstances of this case, that the trial court's jury instructions, taken as a whole, adequately instructed the jury on the law of the murder of a witness. Nothing in the record indicates that the jury was confused by the straightforward instructions of the trial court or that the jury could have misunderstood the elements of the capital offense so as to believe that it could convict Whitehead without finding that he knew of Whitten's status as a witness.
Even assuming that the trial court's instructions were erroneous, we find the following language in Crowe v. State, 485 So.2d 351 (Ala.Cr.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986), to be instructive:
"The appellant contends that the trial court committed reversible error by its failure to instruct the jury that the capital offense of murder of a police officer requires knowledge by the defendant of the officer's status. Appellant argues that this court must reverse on the basis of the Alabama Supreme Court's decision in Ex parte Murry, 455 So.2d 72 (Ala.1984).
"In Murry the Court opined that failure to charge on this element is reversible error. However, the case sub judice is distinguishable from Murry. In Murry, the issue of knowledge was one for the jury when the defendant testified at trial that he did not know that the persons he shot were law enforcement officers. In the present case no lack of knowledge was ever claimed[;] the appellant relied on an alibi defense.
"Further, in the present case, the fact that the victim was a law enforcement officer was undisputed and shown conclusively by evidence elicited during trial. The victim was in uniform and sitting in a marked patrol car in front of *843 the jail. The issue of knowledge was not before the jury.
"Moreover, `[a]n instruction which ignores, or omits to charge on, a material issue or element of the case is not grounds for reversal if accused is not prejudiced thereby, as where no other verdict than that of guilty is warranted by the evidence, where the issue or element ignored is shown conclusively by the evidence, where the omission is with respect to facts not supported by the evidence, or where the error is remedied by other instructions given.' 24 B, C.J.S., § 1922(9) (1962)."
485 So.2d at 362.
We do not believe that Whitehead was prejudiced by the trial court's instructions on the murder of a witness. The fact that Whitehead knew of Whitten's status as a witness was shown conclusively by the evidence at trial; the instruction that Whitehead claims should have been given by the trial court was "with respect to facts not supported by the evidence"i.e., Whitehead's alleged lack of knowledge was not supported by any evidence at trial; and the trial court's instructions, as we discussed above, when taken as a whole, remedied any error in the court's failure to specifically instruct the jury that it must find that Whitehead had knowledge of Whitten's status as a witness. Thus, any error was, at most, harmless. See Neder v. United States, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (the omission of an element of the offense in the trial court's charge to the jury is subject to a harmless error analysis).

XV.
Whitehead contends that the trial court committed reversible error "by denying [his] request for a lesser included [jury] instruction [on] intentional murder." (Issue I in Whitehead's brief to this court, p. 1.) Specifically, he contends that the evidence was conflicting as to whether there was an entry into Whitten's house and as to whether he knew that Whitten was a witness. Therefore, he argues, the trial court should have instructed the jury on intentional murder.
At the outset, we note that Whitehead did not properly preserve these claims; therefore, we may review them only for plain error. See Rule 45A, Ala. R.App.P. Although Whitehead did object to the trial court's failure to give a charge on intentional murder, his objection was not sufficient to preserve the arguments he now makes on appeal. Whitehead made only a general objection, and did not specify any grounds for his objection. Rule 21.3, Ala.R.Crim.P., states:
"No party may assign as error the court's giving or failing to give a written instruction, or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
See also Jones v. State, 591 So.2d 569, 573 (Ala.Cr.App.1991) (not only must the defendant object to the court's failure to give his requested charge, but he must state particular grounds for the objection). We find no error, plain or otherwise.
"`In Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the United States Supreme Court held that the sentence of death could not be imposed after a jury verdict of guilt of a capital offense when the jury was precluded from considering a verdict of guilt of a lesser included noncapital offense, provided that the evidence would have supported such a verdict. Subsequently, in Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the Supreme Court clarified its decision in Beck, supra, to require that only when the evidence warrants such an instruction must a lesser included offense instruction be given. In so holding, the Court upheld the constitutionality of *844 the following Alabama standard as applied in capital cases: "a lesser included offense instruction should be given if `there is any reasonable theory from the evidence which would support the position.'" Hopper, 456 U.S. at 611, 102 S.Ct. at 2053 (quoting Fulghum v. State, 291 Ala. 71, 75, 277 So.2d 886, 890 (1973)).'
"Ex parte Julius, 455 So.2d 984, 986 (Ala.1984)."
Hyde, 778 So.2d at 209-10.
In Williams v. State, 675 So.2d 537 (Ala. Cr.App.1996), we stated the rule as follows:
"`A person accused of the greater offense has a right to have the court charge on the lesser offenses included in the indictment when there is a reasonable theory from the evidence supporting his position. Chavers v. State, 361 So.2d 1106 (Ala.1978); Fulghum v. State, 291 Ala. 71, 277 So.2d 886 (1973); Wiggins v. State, 491 So.2d 1046 (Ala.Cr. App.1986); Wilkerson v. State, 486 So.2d 509 (Ala.Cr.App.1986). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury. Lami v. State, 43 Ala.App. 108, 180 So.2d 279, cert. denied, 278 Ala. 710, 180 So.2d 282 (1965). Every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility. Ex parte Stork, 475 So.2d 623 (Ala.1985); Chavers v. State, supra; Burns v. State, 229 Ala. 68, 155 So. 561 (1934). Section 13A-1-9(b), [Ala.Code 1975,] provides, "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."'"
675 So.2d at 540, quoting Anderson v. State, 507 So.2d 580, 582-83 (Ala.Cr.App. 1987) (quoting, in turn, Phelps v. State, 435 So.2d 158, 163 (Ala.Cr.App.1983)).
Regarding Whitehead's contention that an intentional murder instruction was warranted for the murder-burglary count, there was no rational basis for the charge. The undisputed evidence showed that Whitehead's accomplice, Hyde, unlawfully entered Whitten's house and that he intentionally and unlawfully caused a bullet to enter Whitten's house, which ultimately caused Whitten's death. Based on this evidence, there was no rational basis for convicting Whitehead of the lesser included offense of intentional murder, and a charge on that offense would have served only to confuse or mislead the jury. Because there was no dispute that the bullet entered Whitten's house and because it is well settled that entry of a bullet into a house is sufficient to constitute an entry under the burglary statute, there was no reasonable theory from the evidence to support a charge on intentional murder with respect to the murder-burglary count, and thus there was no error, plain or otherwise, in the trial court's failure to so instruct the jury.
With respect to the two counts of the murder of a witness, there was also no error in failing to instruct the jury on the lesser included offense of intentional murder. Contrary to Whitehead's claim, the evidence was undisputed that Whitehead knew at the time of the murder that Whitten was a witness. Several State's witnesses testified that they had heard Whitehead speak about killing Whitten to prevent the Hudson Foods theft investigation from leading to charges and to enable him to file a civil suit against Hudson Foods. Jason Windsor, Wanda Self, Christy Clark, Angelina Whitehead, Randall Ogle, Christina Phelphs, and Steven Brookshire all testified that they heard Whitehead refer to killing Whitten "his witness"to prevent a theft trial and to enable him to file his civil lawsuit. *845 (R. 1403.) Christina Phelphs specifically stated that Whitehead told her that "Andy Whitten was his only witness and he had to get him out of the way." (R. 1281.) Steven Brookshire also testified that Whitehead told him, on the day of the murder, that "he had to get rid of his witness." (R. 1403.) Moreover, the State presented evidence showing that Andy Whitten was the investigator on the Hudson Foods matter; that he had interviewed Whitehead concerning the possible theft charges; that Whitehead was indicted on the theft charges and a trial date was set; and that Whitten was killed just six days before the theft trial was to begin. All of this evidence was undisputed, and it clearly established that Whitehead knew that Whitten was a witness at the time of the murder. Thus, there was no theory of the evidence from which the jury could reasonably have concluded that Whitehead was guilty only of intentional murder rather than capital murder, and the trial court's refusal to so instruct the jury was not error, much less plain error.

XVI.
Whitehead contends that the State was allowed to present improper victim-impact evidence at the sentencing phase of his trial. (Issue VII in Whitehead's brief to this court.) He specifically challenges as improper the testimony of Whitten's father and brother. Initially we note that Whitehead did not object to this testimony at trial; therefore, we will review his claim under the plain-error rule. Rule 45A, Ala.R.App.P. Whitehead's failure to object weighs heavily against a finding of prejudice in our review for plain error. Knotts v. State, 686 So.2d 431 (Ala. Cr.App.1995), aff'd, 686 So.2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997).
The record reveals that immediately before the sentencing phase before the jury, Whitehead's counsel expressed to the trial court Whitehead's desire to waive sentencing before the jury. The State, although not specifically objecting to Whitehead's decision, requested the jury's "participation" in sentencing. The trial court granted the State's request, and Whitehead made no objection. The prosecutor then made a brief opening statement to the jury, after which Whitehead's counsel informed the jury that Whitehead had waived his right to present opening and closing statements before the jury. After calling as a witness Whitehead's parole officer to establish that Whitehead was on parole when he shot and killed Whitten, the state then called the victim's brother, Mike Whitten, to testify. Mike Whitten testified concerning the effect that his brother's death had had on him and his family. When asked by the prosecutor whether he was asking for the jury to recommend the death penalty for Whitehead, he stated that he was begging the juryfor himself, for his father, and for every police officerto recommend a death sentence for Whitehead. (R. 1800.) The victim's father, Edsel Whitten, also testified at the sentencing hearing and also asked the jury to recommend a death sentence, not only to vindicate his son, but to vindicate every law enforcement officer in the country. (R. 1807.)
Before the State made its closing remarks to the jury, the following exchange occurred outside the presence of the jury:
"The Court: Gentlemen, with no defense being offered by the defendant, I think we need to make a record that the defendant has discussed this matter with his attorney and is making an intelligent, knowing decision not to present any evidence at all for the defense. I'm sure, [Whitehead's counsel]and knowing you as well as I do know youthat you have done this and have discussed it with Mr. Whitehead. Mr. Whitehead, you do understand, however, and I need to explain to you, that there are matters known as mitigating circumstances; do you understand that?
"[Whitehead]: Yes, sir.

*846 "The Court: You understand you have the right to present evidence to that?
"[Whitehead]: Yes, sir.
"The Court: That you have the right to make any defense that you have to the jury in attempting to contest the aggravating circumstances which they have shown and you have the right to present any mitigating circumstances?
"[Whitehead]: Yes, sir.
"The Court: [Whitehead's counsel], have you discussed this with Mr. Whitehead?
"[Whitehead's counsel]: We have, Your Honor, on more than one occasion this past week. Mr. Whitehead has expressed his desire not to call any witnesses. We discussed family members being called and he has declined to have any of his family to testify for him. Larry, is that right? Do you have anything you want to say?
"[Whitehead]: No, sir.
"The Court: Do you have any matter that you would like to present that Mr. Whitehead does not understand the proceeding or understand what he has the right to do?
"[Whitehead's counsel]: No, sir, Your Honor. I think he understands definitely and he's made the decision not to call any family or friends or any witnesses to mitigate under the circumstances.
"The Court: Mr. Whitehead, have you presented or submitted anything to [your counsel] in defense of this case that he has not gone throughout to your satisfaction?
"[Whitehead]: No, sir.
"The Court: Are you totally and completely satisfied with [your counsel's] advice and services in this matter?
"[Whitehead]: Yes, sir.
"The Court: You are giving up your right to any defense in this sentencing procedure voluntarily, knowing what you are doing?
"[Whitehead]: Yes, sir."
(R. 1808-11.) On appeal, Whitehead contends that the testimony of the victim's family to the effect that death was the appropriate sentence for Whitehead was improper under both Alabama and federal law. Whitehead claims that the complained-of testimony was "clearly a factor in the jury's recommendation and the trial court's sentencing decision." (Whitehead's brief to this court, p. 36.) The State argues that while the admission of this testimony was improper, any error was harmless beyond a reasonable doubt. We agree.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are admissible for the jury's consideration during the sentencing phase of a capital murder trial. "Payne overruled Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), which had prohibited the introduction of such evidence at the penalty phase, and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989)." McNair v. State, 653 So.2d 320, 331 (Ala. Cr.App.1992), aff'd, 653 So.2d 353 (Ala. 1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995).
"`However, the Payne court did not overrule the rule stated in Booth prohibiting consideration of a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence during the sentencing phase of a capital murder trial. See 501 U.S. at 830, n. 2 [111 S.Ct. at 2611, n. 2].'"
Arthur v. State, 711 So.2d 1031, 1093 (Ala. Cr.App.1996), aff'd, 711 So.2d 1097 (Ala. 1997), quoting Ex parte Rieber, 663 So.2d 999, 1006-07 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995). The type of evidence given by the victim's family in this case went beyond that deemed admissible under Payne. Here, Mike Whitten and Edsel Whitten offered *847 their opinions on what they thought the appropriate sentence should be for Whitehead. Such testimony was inadmissible and therefore was improperly presented to the jury for its consideration in sentencing.
Although we have held that Mike Whitten and Edsel Whitten's testimony was improperly admitted into evidence, our analysis does not end there.
"After finding error, an appellate court may still affirm a conviction or sentence on the ground that the error was harmless, if indeed it was. Chapman [v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)]; Sattari v. State, 577 So.2d 535 (Ala.Cr.App.1990), cert. denied, 577 So.2d 540 (Ala.1991); A.R.App.P. 45. Moreover, the harmless error rule applies in capital cases. Ex parte Whisenhant, 482 So.2d 1241 (Ala. 1983); Henderson v. State, 583 So.2d 276 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991). cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Musgrove v. State, 519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). In order for a constitutional error to be deemed harmless under Chapman, the state must prove beyond a reasonable doubt that the error did not contribute to the verdict and/or sentence.... In order for the error to be deemed harmless under Ala.R.App.P. 45, the state must establish that the error did not or probably did not injuriously affect the appellant's substantial rights.... The purpose of the harmless error rule is to avoid setting aside a conviction or sentence for small errors or defects that have little, if any, likelihood of changing the result of the trial or sentencing. We conclude that the error could not have contributed to the sentence, nor injuriously affected a substantial right of the appellant."
Davis v. State, 718 So.2d 1148, 1164 (Ala. Cr.App.1995); see also Delaware v. Arsdall, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."). Further, plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. See Bush v. State, 695 So.2d 70, 87 (Ala. Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Rule 45A, Ala. R.App.P. The United States Supreme Court has recognized that most errors do not automatically render a trial unfair and, thus, can be harmless. See Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). This includes the improper admission of evidence at the sentencing stage of a capital case. See Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).
In this case, Whitehead voluntarily declined to present any evidence of statutory and nonstatutory mitigating circumstances. Thus, no mitigating evidence was injected into the trial by Whitehead, much less argued by his counsel to the jury. The State argued five statutory aggravating circumstances to the jury at sentencing. One of the aggravating circumstances relied on by the State, that the murder was committed during a burglary, was conclusively established by the jury's verdict finding Whitehead guilty of that capital offense. See §§ 13A-5-49(4), 13A-5-50, and 13A-5-45(e), Ala.Code 1975. Further, the aggravating circumstance that, at the time of Whitten's murder, Whitehead was under a sentence of imprisonment was also conclusively established by the State at the sentencing hearing. See § 13A-5-49(1), Ala.Code 1975. Whitehead's parole officer testified that at the time of Whitten's murder, Whitehead was on parole for a 1989 felony conviction for escape in the first degree. The State also argued that Whitehead's felony conviction for escape involved the use or threat of violence to *848 the person, and thus, constituted another aggravating circumstance. See § 13A-5-40(2), Ala.Code 1975. Further, as aggravating circumstances, the State argued that the murder was committed for pecuniary gain and to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws. See §§ 13A-5-40(6) and (7), Ala.Code 1975. These two aggravating circumstances, by way of the evidence presented at trial and the jury's verdicts finding Whitehead guilty of the murder of a witness, were sufficiently established by the State at trial.
Moreover, the trial court correctly instructed the jury on aggravating and mitigating circumstances and the process to be used in weighing those circumstances to determine the proper sentence. It instructed the jurors that although no mitigating circumstances had been presented to them by Whitehead, they could consider any mitigating circumstances presented by way of the evidence at the guilt phase of the trial. The trial court also read to the jury the list of statutory mitigating circumstances provided for in § 13A-5-51, Ala. Code 1975. It also instructed the jury that a mitigating circumstance included any aspect of Whitehead's character or record and any of the circumstances of the offense that Whitehead offered as a basis for a sentence of life imprisonment without the possibility of parole instead of death. See § 13A-5-52, Ala.Code 1975. Moreover, the jury was instructed as follows:
"In reaching your finding concerning the aggravating and mitigating circumstances in this case and in determining what to recommend that the punishment in this case should be, you must avoid any influence of passion prejudice, emotion, or any other arbitrary factor. Your deliberation and verdict should be based upon the evidence you have seen and heard and the law on which I have instructed you. There is no room for the influence of passion, prejudice, or any other arbitrary factor."
(R. 1828-29.) Jurors are presumed to follow the instructions of the trial court. See Taylor v. State, 666 So.2d 36 (Ala.Cr.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). The jury recommended, by a vote of 12-0, that Whitehead be sentenced to death.
The trial court thereafter conducted another sentencing hearing, at which Whitehead again neither presented nor argued any evidence of mitigating circumstances. The trial court found the existence of four aggravating circumstances: that the murder was committed during a burglary; that the murder was committed while Whitehead was under a sentence of imprisonment; that the murder was committed for pecuniary gain; and that the murder was committed to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws. In its sentencing order, the trial court stated that although Whitehead had submitted no evidence of mitigating circumstances and although he did not argue that any mitigating circumstances existed, the court had attempted to find mitigating circumstances, but it was unable to do so. The trial court also stated that it was aware that the murder of a witness and the murder of a police officer were not aggravating circumstances to be considered in determining the proper sentence. There is nothing in the trial court's sentencing order that indicates that it considered, in sentencing Whitehead to death, the testimony of Whitten's family. We presume that the trial court disregarded any inadmissible or improper considerations in its sentencing determination. See Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).
Although we have concluded that the victim-impact testimony was improper, we also conclude that its admission was harmless beyond a reasonable doubt. Juxtaposed against the strong evidence of aggravating *849 circumstances and the absence of any statutory or nonstatutory mitigating circumstances, it is clear that the victim-impact testimony did not contribute to the jury's sentencing recommendation. Its admission did not relieve the State of its burden of proving beyond a reasonable doubt the existence of at least one aggravating circumstance. We are convinced that had the improper testimony of Whitten's family been excluded by the trial court, the jury would still have returned a recommendation of death. No jury, properly instructed, could reasonably have found otherwise. The jury surely recognized the testimony of the victim-impact witnesses as a normal, human reaction to the death of a loved one. That these witnesses wanted Whitehead to receive the death penalty would come as no surprise to the members of the jury.
We note that recently, in Wimberly v. State, 759 So.2d 568 (Ala.Cr.App.1999), this court reversed Wimberly's convictions for capital murder because, we found, he had not been advised of his juvenile-Miranda rights before giving his statement to police, and, therefore, his statement was not voluntarily made. We further found that the admission of the statement in that case was not harmless error. We also addressed in Wimberly, under our review for plain error, the admission of victim-impact evidence at the sentencing phase of the trial before the jury. In Wimberly, one of the victim's daughters read a statement to the jury during the penalty phase. As we stated in Wimberly:
"Not only did this statement read to the jury contain improper comments on the family member's characterization and opinion of the defendant and the crime, along with a strongly worded exhortation for the jury to return a death sentence, the statement also put before the jury improper comments on facts not in evidence, an improper plea for the jury to put themselves in the place of the victim's family, an improper comment upon the probability or possibility of what might happen in the future concerning a particular sentence, an improper comment on Wimberly's exercise of his constitutional right to remain silent, and an improper comment on Wimberly's exercise of his fundamental right to plead not guilty and to require the State to meet its burden of proof as evidence of a lack of remorse."
759 So.2d at 573 (citations omitted). We found in Wimberly that the "cumulative effect" of all of the improper comments constituted plain error. Wimberly, 759 So.2d at 573. We find that the present case is easily distinguishable from Wimberly. Here, the only improper comment by the victim's family was a comment on what they thought the appropriate punishment for Whitehead should be. Whitten's family did not, like the family member in Wimberly, make repeated, prejudicial comments about the defendant and his constitutional rights. Further, in Wimberly, the defendant was only 17 years old at the time of the murder, and thus, as a result, this was a mitigating circumstance for the jury to consider. Here, the evidence was sufficient to support not simply one or two aggravating circumstances, but four aggravating circumstances. The outcome of the jury's and the trial court's sentencing did not turn on Whitten's family's testimony concerning what they thought was the appropriate sentence in this case. We can safely hold that the portion of the victim-impact evidence that was improperly admitted was harmless beyond a reasonable doubt, did not affect Whitehead's substantial rights, and did not rise to the level of plain error. We reach this conclusion, even though we recognize the utmost importance in ensuring that Whitehead's death sentence not be based on improper or arbitrary considerations. For these reasons, we find no plain error as to this claim

XVII.
Whitehead contends that the jury and the trial court impermissibly "double-counted" the burglary charge *850 against him both as an element of the capital offense and as an aggravating circumstance. (Issue XVIII in Whitehead's brief to this court.) Whitehead is presenting this claim for the first time on appeal; therefore, we will review it only pursuant to the plain-error rule. Rule 45A, Ala. R.App.P. There is no merit to this contention.
"The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as `double-counting' or `overlap' and is constitutionally permissible." Coral v. State, 628 So.2d 954, 965 (Ala.Cr.App.), aff'd on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); see also Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); and Hart v. State, 612 So.2d 520 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Section 13A-5-50, Ala.Code 1975, contemplates that certain aggravating circumstances will be considered established for purposes of sentencing when a verdict of guilty of capital murder is returned. That section specifically provides:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Section 13A-5-45(e) further provides, in pertinent part, that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Thus, we find no plain error here.

XVIII.
Whitehead asserts that Alabama's capital sentencing statute is unconstitutional because, he argues, it does not state what weight the trial court is to give the jury's sentencing recommendation. (Issue XIX in Whitehead's brief to this court.) He also asserts that the jury's sentencing recommendation violated the Eighth Amendment because, he says, it failed to specify which, if any, aggravating circumstances the jury found to exist in Whitehead's case. Whitehead did not raise either of these claims in the trial court; thus, our review is for plain error. Rule 45A, Ala. R.App.P.
Whitehead's first claim was addressed and rejected by the United States Supreme Court in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). The Court in Harris held that "the Eighth Amendment does not require the State to define the weight the sentencing judge must accord to an advisory jury verdict." 513 U.S. at 512, 115 S.Ct. at 1036. The court further held:
"The Constitution permits the trial judge, acting alone, to impose a capital sentence. It is thus not offended when a State further requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight."
513 U.S. at 515, 115 S.Ct. at 1037; see also Boyd v. State, 715 So.2d 825, 846 (Ala.Cr. App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).
Alabama's capital sentencing statute "adequately channels the trial court's discretion so as to prevent arbitrary results." Bush v. State, 695 So.2d 70, 94 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. *851 denied, U.S., 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citing Harris and rejecting claims that Alabama's statute permits a standardless override). Because Whitehead's claim has previously been addressed and rejected, there is no plain error as to this matter.
As to Whitehead's second claim, it has likewise been addressed and rejected by the Alabama Supreme Court in Ex parte Trawick, supra, in which that Court held:
"[T]here is no established Federal constitutional requirement or state law requirement that a jury specify the aggravating circumstances that it finds to exist. Haney v. State, [603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)]. The jurors in this case were properly instructed on the aggravating and mitigating circumstances and on the process to be used in weighing these circumstances. We therefore find no error in the jury's failure to specify the aggravating circumstances that it apparently found to exist."
698 So.2d at 178. Here, as in Ex parte Trawick, Whitehead's jury was properly instructed on the aggravating and mitigating circumstances and on the process to be used in weighing those circumstances. Accordingly, we find no plain error as to this matter.

XIX.
Whitehead also contends that he was entitled, under both Alabama and federal constitutional law, to "two attorneys who were experienced in criminal and capital litigation." (Issue XVII in Whitehead's brief to this court, p. 70.) In support of his claim, Whitehead cites this court to § 13A-5-54, Ala.Code 1975, which provides that a person indicted for a capital offense who is not able to afford an attorney must be provided with court-appointed counsel having no less than five years' prior experience in the active practice of criminal law. Initially we note that Whitehead did not raise this issue in the trial court; therefore, our review will be for plain error. Rule 45A, Ala.R.Crim.P.
As the state correctly points out in its brief to this court, Whitehead does not argue on appeal, nor does the record indicate, that his appointed attorney, Hoyt Baugh, lacked the requisite five years' experience in the active practice of criminal law required under § 13A-5-54. Whitehead complains only that he should have been appointed two attorneys instead of one. However, under § 13A-5-54, contrary to Whitehead's claim, Whitehead was only entitled to one attorney with five years' experience in the active practice of criminal law; therefore, because § 13A-5-54 does not provide for the appointment of two attorneys with five years' experience in the active practice of criminal law, we find that Whitehead had the counsel to which he was entitled.

XX.
Whitehead also contends that § 15-12-21(d), Ala.Code 1975, which limits court-appointed attorneys' fees to $1,000 for out-of-court work in each phase of a capital murder trial, is unconstitutional. (Issue XX in Whitehead's brief to this court.) Specifically, he argues that this limitation on compensation violates the separation-of-powers doctrine; that it constitutes a taking without just compensation; that it deprives an indigent capital defendant of effective assistance of counsel; and that it denies the indigent defendant equal protection of the law. These claims were not presented in the trial court; thus, our review is for plain error. Rule 45A, Ala. R.App.P.
Whitehead's claims have been previously addressed and rejected by this court and by the Alabama Supreme Court. See, e.g., Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. *852 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Samra v. State, 771 So.2d 1108 (Ala.Cr. App.1999); Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); Barbour v. State, 673 So.2d 461 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); May v. State, 672 So.2d 1307 (Ala. Cr.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v. State, 581 So.2d 497 (Ala.Cr. App.1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991), aff'd on return to remand, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997). Accordingly, there is no plain error as to this matter.

XXI.
Whitehead contends that Alabama's use of the electric chair in carrying out the death penalty does not meet constitutional standards. (Issue XXI in Whitehead's brief to this court.) He specifically argues that Alabama uses "faulty equipment, unqualified personnel, and inadequate procedures" and that Alabama's electric chair results in excessive burning and mutilation of condemned prisoners' bodies. (Whitehead's brief to this court, pp. 75-77.) These claims were not presented to the trial court; thus, our review is for plain error. Rule 45A, Ala.R.App.P.
It is well settled that death by electrocution does not constitute cruel and unusual punishment in violation of the Eighth Amendment. See Lindsey v. Smith, 820 F.2d 1137 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989); Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Stephens v. State, 580 So.2d 11 (Ala.Cr.App. 1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
Moreover, Whitehead's claims that Alabama's electric chair is antiquated and inadequate and that it results in burning and mutilation of the bodies of those executed have been previously addressed and decided adversely to him. See Thomas v. Jones, 742 F.Supp. 598, 602 (S.D.Ala.1990); Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala. 1983), aff'd in relevant part, rev'd in unrelated part, 726 F.2d 1505, 1519 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Jackson, 516 So.2d at 738. Accordingly, there is no plain error as to this matter.

XXII.
Whitehead contends that the cumulative effect of all the errors allegedly committed in his trial violated his rights to due process and to a fair trial. (Issue XXII in Whitehead's brief to this court.) We do not agree. We have reviewed each and every allegation of error as well as the cumulative effect of such alleged errors and find that the cumulative effect of these alleged errors does not warrant a reversal. Moreover, Whitehead's arguments asserting these claimed errors have now been determined to be without merit. Because no single instance of alleged error constituted reversible error, we will not consider the cumulative effect to be any greater. See Boyd v. State, 715 So.2d 825, 851 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).

*853 XXIII.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Whitehead's capital murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings, either in the guilt phase or in the sentencing phase of the trial.
We have also reviewed Whitehead's sentence in accordance with the § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Whitehead's capital murder convictions, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Whitehead of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by electrocution by a vote of 12-0.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Whitehead to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Whitehead's participation in the offense.
In its findings of fact, the trial court found the existence of four statutory aggravating circumstances: (1) that the murder was committed while Whitehead was under sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; (2) that the murder was committed while Whitehead was engaged in the commission of a burglary, see § 13A-5-49(4), Ala.Code 1975; (3) that the murder was committed for pecuniary gain, see § 13A-5-49(6), Ala. Code 1975; and (4) that the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws, see § 13A-5-49(7), Ala.Code 1975.
The trial court found the existence of no statutory or nonstatutory mitigating circumstances. The trial court noted in its sentencing order that although Whitehead *854 did not submit any evidence of mitigating circumstances, nor did he argue that any mitigating circumstances existed, it had attempted to find mitigating circumstances but was unable to do so. (C. 284-85.)
The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstances against any statutory and nonstatutory mitigating circumstances, the trial court found that the aggravating circumstances outweighed the mitigating circumstances, especially since Whitehead offered no mitigating circumstances to offset those aggravating circumstances found to exist. Accordingly, because there were four statutory aggravating circumstances and no mitigating circumstances, the trial court properly sentenced Whitehead to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence.
Whitehead was convicted of one count of the offense of murder committed during the course of a burglary and two counts of the murder of a witness. These offenses are defined by statute as capital offenses. See §§ 13A-5-40(4) and (14), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998); and also Freeman v. State, 776 So.2d 160 (Ala.Cr.App.1999); Neal v. State, 731 So.2d 609 (Ala.Cr.App.1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999); Knotts v. State, 686 So.2d 484 (Ala. Cr.App.1995), aff'd, 686 So.2d 486 (Ala. 1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997); Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); and Thomas v. State, 539 So.2d 375 (Ala.Cr.App.), aff'd, 539 So.2d 399 (Ala. 1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989).
After carefully reviewing the record of the guilt phase and the sentencing phase of Whitehead's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the statutory and nonstatutory mitigating circumstances, keeping in mind that there are no mitigating circumstances in this case, and we concur in the trial court's judgment that death is the appropriate sentence in this case. Considering the crime committed by Whitehead, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Whitehead's convictions and sentence of death are affirmed.
AFFIRMED.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] We note that since Whitehead's trial, Rule 19.3(a) has been amended, effective December 1, 1997, to conform to § 12-6-9.
[2] The record reveals that Mike Whitten, the victim's brother, testified at the guilt phase of the trial. He testified that his brother was able to get to the telephone and to call him to tell him that he had been shot. He further testified that he immediately went to his brother's house and waited with his brother for the paramedics to arrive. The record also reveals that several members of the victim's family testified at the penalty phase of the trial.
[3] Whitehead was originally charged with the capital offense of the murder of a police officer on duty, see § 13A-5-40(a)(5), Ala.Code 1975, but that charge was dropped before trial.